In the Matter of CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner, v PUBLIC SERVICE COMMISSION, Respondent, and BROOKLYN UNION GAS COMPANY, Intervenor-Respondent.

Third Department, December 30, 1983

APPEARANCES OF COUNSEL

*Kronish, Lieb, Shainswit, Weiner & Hellman (Bernard L. Sanoff* of counsel), and *Joy Tannian, Peter Garam, John D. McMahon* and *Celeste A. Contrucci* for petitioner.

*David E. Blabey (Howard J. Read* of counsel), for respondent.

*Cullen & Dykman (William R. Coleman, Joseph P. Stevens, James F. Matthews* and *Theresa Mady Grove* of counsel), for intervenor-respondent.

*Chadbourne, Parke, Whiteside & Wolff* for American Paper Institute, Inc., *amicus curiae*.

OPINION OF THE COURT

MAIN, J.

On November 9, 1978, the Public Utility Regulatory Policies Act of 1978 (PURPA) was signed into law as part

of the Federal response to the nationwide energy crisis. Section 210 of PURPA (US Code, tit 16, § 824a-3) was designed to encourage the development of alternate energy sources, and thereby decrease dependence on traditional fossil fuels, by requiring the Federal Energy Regulatory Commission (FERC) to adopt rules requiring, *inter alia,* electric utilities to purchase electric energy from any cogeneration facility or small power production facility qualifying under Federal rules[1] (US Code, tit 16, § 824a-3, subd [a]). Section 210 of PURPA further provides that the rate established by FERC for the purchase of such electricity:

"(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

"(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

"No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy"[2] (US Code, tit 16, § 824a-3, subd [b]).

This section also permits FERC to exempt Federal qualifying facilities from certain Federal and State laws governing electric utilities if such was deemed necessary to encourage cogeneration and small power production (subd [e]). Under section 210 of PURPA, State regulatory authorities are charged with implementing the rules promulgated by FERC (subd [f]). These rules, in 1980, were promulgated by FERC (18 CFR part 292) and they established the rate for the purchase of electricity from Federal qualifying facilities at the avoided cost (18 CFR 292.304 [b] [2]), the statutory maximum rate, and ruled that all Federal qualifying facilities eligible for the exemption should be exempt from certain provisions of the Federal Power Act (18 CFR 292.601).

---

1. A "cogeneration facility" is defined as one that produces both electric energy and steam or some other form of useful energy, such as heat (US Code, tit 16, § 796, subd [18], par [A]). A "small power production facility" is defined as one that has a production capacity of not more than 80 megawatts and uses biomass, waste, geothermal resources or renewable resources, such as wind, water or solar energy, to produce electric power (US Code, tit 16, § 796, subd [17], par [A]). We will refer to such facilities together as Federal qualifying facilities.

2. This "incremental cost" is defined as the cost to the utility of the electric energy which, but for its purchase from a Federal qualifying facility, the utility would generate or purchase from another source (US Code, tit 16, § 824a-3, subd [d]) and shall be referred to herein as either incremental cost or avoided cost.

Also in 1980, New York State enacted legislation, like PURPA, designed to develop alternate energy sources by encouraging cogeneration and small hydro facilities (Public Service Law, § 66-c, subd 1). The definitions for such facilities (Public Service Law, § 2, subds 2-a — 2-c) overlap aspects of the Federal definitions, but are not identical thereto.[3] The State law, as amended, further requires electric utilities to enter into long-term contracts to purchase electricity or useful thermal energy from State qualifying facilities under terms that are "just and economically reasonable to the corporation's ratepayers, non-discriminatory to [State qualifying facilities] and [in furtherance of] the public policy" behind the legislation, but at a sales price not less than 6 cents per kilowatt hour (Public Service Law, § 66-c, subd 1, par [a]).

Proceedings to implement the Federal and State legislation and regulations were held before respondent Public Service Commission (PSC) and culminated in an opinion issued May 12, 1982. On September 9, 1982, petitioner Consolidated Edison Company of New York, Inc., instituted this CPLR article 78 proceeding to review various aspects of the PSC's opinion. After this proceeding was transferred to this court, petitioner and the PSC stipulated to hold the case in abeyance pending the outcome of *American Paper Inst. v American Elec. Power Serv. Corp.* (461 US __, 103 S Ct 1921), then before the Supreme Court and since decided. Based on the decision in *American Paper,* which upheld the validity of FERC's rules under section 210 of PURPA, and *Arkansas Elec. Coop. Corp. v Arkansas Public Serv. Comm.* (461 US __, 103 S Ct 1905), decided the same day, petitioner dropped all but the three issues concerning the rates for the purchase of electricity from Federal and State qualifying facilities now before us. We note that we granted leave to intervene to Brooklyn Union Gas Company and leave to file a brief *amicus curiae* to American Paper Institute, Inc.

Petitioner challenges two of the PSC's determinations on pre-emption grounds. First, petitioner contends that the PSC's determination requiring it to purchase electricity

---

**3.** The cogeneration and small hydro facilities defined by State law shall be referred to as State qualifying facilities.

from on-site generators that are not Federal qualifying facilities is invalid as contrary to the Federal Power Act (FPA) (US Code, tit 16, § 791a *et seq.*), under which wholesale sales of electricity from on-site generators to electric utilities in interstate commerce are subject to FERC's exclusive jurisdiction (US Code, tit 16, § 824). Second, petitioner contends that the State-mandated minimum purchase rate of 6 cents per kilowatt hour is at times higher than the Federal rate of avoided cost set by FERC and, thus, is invalid as contrary to Federal law.

 Initially, we reject the procedural challenges to petitioner's claims. The PSC failed to raise at the appropriate time petitioner's alleged lack of standing and failure to exhaust its administrative remedies and, thus, we deem these challenges to be waived (see *Matter of Hilton v Dalsheim,* 81 AD2d 887, 888; *Matter of Cook v Town of New Scotland,* 75 AD2d 703, 704; see, also, CPLR 7804, subd [f]). We further note that although the PSC did not comment on the first pre-emption ground raised by petitioner, apparently because petitioner did not raise it at the time of the enactment of the State legislation before the administrative law judge's recommended decision, we shall entertain this issue because petitioner did raise it in submissions before the PSC's final opinion. Likewise, we reject Brooklyn Union's claim that petitioner's second pre-emption claim is an impermissible collateral attack on the PSC's reliance on FERC's Order No. 69 because the rule against such attacks of administrative determinations is not applicable where the agency acted outside its jurisdiction in a manner not authorized by statute (see, e.g., 2 NY Jur 2d, Administrative Law, §§ 150, 176, pp 236, 282), which is petitioner's claim herein.

 On the merits, we conclude that Federal law has pre-empted this area and that New York State law or regulations cannot require petitioner to purchase electricity from on-site generators unless they are Federal qualifying facilities or to purchase electricity from such facilities at a rate greater than the Federally mandated rate. A review of the legislative intent behind the enactment of section 210 of PURPA, as well as the legislative framework of the FPA and PURPA, leads us to this result. In reaching

this conclusion, we emphasize that the policy being addressed is the Federal policy of developing alternate energy sources to combat the nationwide energy crisis and not the State policy of utility regulation. The Federal Government has undertaken substantial activity in the energy field to benefit the Nation as a whole and, where State action is contrary, it must fall (see, e.g., *Fidelity Fed. Sav. & Loan Assn. v De La Cuesta,* 458 US 141, 152-154; *Chicago & North Western Transp. Co. v Kalo Brick & Tile Co.,* 450 US 311, 317).

■ The authority of FERC, and its predecessor the Federal Power Commission, to regulate, under the FPA, wholesale sales of electricity in interstate commerce, no matter how small the interstate effect, is well established (see, e.g., US Code, tit 16, § 824, subd [b]; *Federal Power Comm. v Florida Power & Light Co.,* 404 US 453; *Federal Power Comm. v Southern Cal. Edison Co.,* 376 US 205, 215-216). The PSC claims that the Supreme Court, in *Arkansas Elec. Coop. Corp. v Arkansas Public Serv. Comm.* (461 US __, 103 S Ct 1905, *supra*), modified FERC's authority by permitting State regulation of wholesale sales if the impact on interstate commerce was not undue. The Supreme Court in that case, however, permitted State regulation of wholesale sales of electricity under the legislative framework of the Rural Electrification Act (REA) and not the FPA, thus rendering the case suspect as authority for modification of FERC's jurisdiction under the FPA.

The Supreme Court noted, though, that the State's authority to regulate such wholesale sales under the REA would be pre-empted if the Federal agency with jurisdiction "changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy" (461 US, at p __, 103 S Ct, at pp 1914-1915). In this case, a somewhat different scenario exists, but the Supreme Court's language is instructive. FERC, the agency which has historically regulated wholesale sales of electricity in interstate commerce, did not announce any change in its policy of exclusive jurisdiction over such wholesale sales, but merely acquired additional statutory options under PURPA. Moreover, PURPA itself, enacted against the backdrop of the FPA and FERC's

exclusive jurisdiction, did not herald any changes in FERC's jurisdiction except those specifically provided in the statutory language, none of which transfers such jurisdiction to State regulatory agencies. Consequently, the PSC has no authority to act in this area.

■ We also conclude that to the extent that the State requirement of a 6 cents per kilowatt hour minimum purchase price conflicts with the Federal rule establishing a purchase price of avoided cost, the State requirement has been pre-empted and is invalid. Our review of the legislative history of section 210 of PURPA indicates that Congress intended States to follow the Federal regulations and not depart from them, especially with regard to the purchase price provision. For example, the Joint Explanatory Statement of the Committee of Conference on PURPA stated that "[section 210] requires that States and utilities follow rules which the Federal Energy Regulatory Commission is to prescribe" (US Code Cong & Admin News, 1978, p 7831) and that "[t]his [avoided cost] limitation on the rates which may be required in purchasing [electricity under section 210] is meant to act as an upper limit on the price at which utilities can be required under this section to purchase electric energy" (*id.*, at p 7832). Thus, it is apparent that Congress did not intend for States to establish rates in excess of the Federal rate, established as the statutory maximum of avoided cost.

This interpretation finds support in the recent Supreme Court decision in *American Paper Inst. v American Elec. Power Serv. Corp.* (461 US __, 103 S Ct 1921, *supra*). In that case, the Supreme Court interpreted the "just and reasonable to the electric consumers" clause of subdivision (b) of section 210 of PURPA as requiring consideration of rate savings for consumers (*supra,* p __, n 9, p 1929, n 9). Such savings are impossible if the State can establish rates in excess of avoided cost. We are not persuaded by the fact that the State's 6 cents per kilowatt hour rate is greater than avoided cost at only certain times, and then by only a very small amount. If we were to approve the State's 6-cent minimum in the face of the lower Federal maximum, we would be establishing a principle which would permit even higher State minimum rates despite lower avoided costs

with the concomitant effect of further limiting potential rate savings for consumers. Indeed, at oral argument the PSC conceded that petitioner may have to pay more for electricity under State law than the avoided cost (see, also, Governor's approval memorandum, NY Legis Ann, 1981, pp 445-446). We decline to approve this State law in the face of contrary Congressional intent and Supreme Court language.

We further note that American Paper Institute's contention that *Federal Energy Regulatory Comm. v Mississippi* (456 US 742) recognizes PURPA's intent to provide States with an authority to go beyond the Federal standards established in section 210 of PURPA is without merit. For example, the Supreme Court's reference to PURPA as " 'cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs' " (*supra,* at p 767) is found in a discussion of titles I and III of PURPA, not of section 210. Likewise, the fact that FERC, in explaining its regulations, has indicated that States may prescribe purchase rates higher than avoided cost (see, e.g., 45 Fed Reg 12221) does not require us to decide differently. Although administrative interpretations are usually accorded great deference, such interpretations need not be followed when contrary to legislative intent (see, e.g., *Public Serv. Comm. v Mid-Louisiana Gas Co.,* 463 US __, __, 103 S Ct 3024, 3035, 3037). As noted, Congress clearly intended that States follow FERC rules and that avoided cost be the maximum purchase price. Accordingly, the State minimum purchase rate of 6 cents per kilowatt hour has been pre-empted and cannot be enforced.

█ The final challenge by petitioner is to the PSC's determination requiring it to give a capacity credit at $21 per kilowatt for electricity supplied by on-site generators during the summer peak period. The PSC's determination must be upheld if it has a rational basis and is supported by substantial evidence in the record (see, e.g., *Matter of New York State Council of Retail Merchants v Public Serv. Comm.,* 45 NY2d 661, 672). Our consideration of this issue and review of the record leads us to conclude that this

determination should be upheld. The record reveals that petitioner charges its largest customers $21 per kilowatt to purchase electricity during summer peaks on the basis that they should pay for capacity costs. Although there may be some uncertainty about the power output of the on-site generators, evidence discloses that a supply of electricity at the peak period has the same effect as a customer's refraining from using electricity during that period and, thus, it is reasonable that the on-site generator supplying the electricity receive a credit for the capacity in the amount that the purchasing customer would have been charged. This rationale is consistent with FERC's approach to alternate energy sources which have some uncertainty in their power output but which can supply maximum power during the summer peaks, such as photovoltaic cells (45 Fed Reg 12225), as well as FERC's regulation, pursuant to PURPA, that electricity be purchased at avoided cost. Thus, the PSC's determination requiring a capacity credit as noted above should be upheld as having a rational basis and support in the record.

The determination should be modified, without costs, by annulling so much thereof as asserted jurisdiction over and made rules regarding wholesale sales of electricity by non-Federal qualifying facilities and as required a minimum purchase price of electricity generated by Federal qualifying facilities in excess of avoided costs, and, as so modified, confirmed.

MAHONEY, P. J., KANE, YESAWICH, JR., and WEISS, JJ., concur.

Determination modified, without costs, by annulling so much thereof as asserted jurisdiction over and made rules regarding wholesale sales of electricity by non-Federal qualifying facilities and as required a minimum purchase price of electricity generated by Federal qualifying facilities in excess of avoided cost, and, as so modified, confirmed.