In the Matter of CENTRAL HUDSON GAS & ELECTRIC CORPORATION et al., Petitioners, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents. (Proceeding No. 1.)

In the Matter of CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent. (Proceeding No. 2.)

Third Department, May 9, 1985

### APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle* (*Stanley W. Widger, Jr.,* of counsel), for Central Hudson Gas & Electric Corporation and another, petitioners in Proceeding No. 1.

*Donal F. McCarthy* for Consolidated Edison Company of New York, Inc., petitioner in Proceeding No. 2.

*Joshua Noah Koenig* and *Hogan & Hartson* (*Gardner F. Gillespie* and *Mary Anne Mason* of counsel), for New York State Cable Television Association, respondent in Proceeding No. 1.

*David E. Blabey* (*Lawrence G. Malone* of counsel), for Public Service Commission of the State of New York, respondent in Proceeding No. 2.

### OPINION OF THE COURT

LEVINE, J.

The instant case culminates a more than decade long dispute between the cable television (hereinafter CATV) industry and State public utilities over regulation of fees charged CATV for use of utility power poles to run CATV cables. A similar controversy occurred at the national level, resulting in litigation before the Federal Communications Commission (FCC) (*see, Matter of CATV Pole Attachments Regulation,* 77 FCC2d 187), the Federal courts (*Monongahela Power Co. v Federal Communications Commn.,* 655 F2d 1254) and in Federal legislation amending the Federal Communications Act (Pub L 95-234; 47 USC § 224). In 1973, the State Cable Television Association and the State Commission on Cable Television petitioned the Public Service Commission (PSC) to complain of claimed excessive charges for attaching cable lines to utility poles. The utilities' legal challenge to PSC regulatory authority was rejected by this court (*Matter of General Tel. Co. v Public Serv. Commn.,* 63 AD2d 93). Meanwhile, the Legislature added Public Service Law § 119-a (L 1978, ch 703), enacted within a matter of days following the latter decision. That amendment conferred jurisdiction on the PSC to establish just and reasonable rates for attachments to utility poles. The section also, however, incorporated a minimum rate recovery to the utilities of not less than their additional costs of providing a pole attachment and a maximum rate recovery of the utilities' "actual operating expenses and return on capital * * * attributed to that portion of

the pole * * * used" (Public Service Law § 119-a). Regarding the foregoing rate ceiling, section 119-a expressed the CATV share of a utility's recovery of pole expenses and return on investment in terms of the CATV's percentage of actual use of the "total usable space" on the pole (Public Service Law § 119-a). Put another way, CATV may not be charged more than a percentage of the utility's pole operating costs and return on pole investment equivalent to the percentage of total usable space on the pole occupied by CATV. The statute further defined "usable space" as "the space on a utility pole above the minimum grade level which can be used for the attachment of wires and cables" (Public Service Law § 119-a).

After remand of the original petition by this court, the PSC elected to hold hearings before an Administrative Law Judge (ALJ). After some 23 days of hearings over more than a two-year period, during which the disputants introduced evidence covering virtually every element of the statutory minimum and maximum rate equations and as to where the rates should fall within those outer limits, the ALJ issued a recommended decision. Of pertinence to the instant proceedings, the ALJ recommended that, for purposes of calculating the total usable pole space (the percentage of which occupied by CATV would determine the maximum rate chargeable by utilities for such use), 40 inches of so-called "neutral space" should be excluded. This favored the utilities' position, since a smaller total usable space would result in a larger percentage thereof used by CATV. The neutral space was derived from requirements of the National Electric Safety Code (NESC) which provided that there be a 40-inch gap on the pole between horizontal electrical conductors and telephone or CATV conductors. The NESC does not, however, prohibit all use of the neutral space on poles and in a significant number of instances, the neutral space is used for the attachment of streetlights, transformers and the like, to which wires running up the pole are connected. The ALJ, however, accepted the utilities' argument that the statutory phrase "usable space" refers only to the portion of the pole available for the attachment of *horizontal* cables and wires and, on this basis, excluded the neutral space from total usable space in the statutory maximum charge ratio.

On exceptions to the ALJ's recommendations made to the full PSC, the ALJ's exclusion of neutral space was rejected. Proceeding No. 1 for a declaratory judgment and proceeding No. 2 for a judgment under CPLR article 78 were then brought, each for the purpose of challenging the PSC's determination to include the neutral space within the total usable space in the statutory rate

equation, essentially on the same principal ground that it conflicted with the statutory definition of usable space. Special Term converted the declaratory judgment action to a CPLR article 78 proceeding and transferred both matters to this court for determination.

At the outset, we note our agreement with the objections to the transfer of these proceedings to this court. Since a hearing by the PSC regarding the original petition on excessive charges for CATV use of utility poles was not mandated by law, Special Term lacked authority to transfer review thereof to the Appellate Division (*see,* CPLR 7804 [g]; 7803 [4]; *Matter of Incorporated Vil. of Val. Stream v State of New York Public Serv. Commn.,* 107 AD2d 856). There may also be validity to the objection to the conversion of the declaratory judgment action to a CPLR article 78 proceeding (*see, Matter of Morgenthau v Erlbaum,* 59 NY2d 143, 150, *cert denied* __ US __, 104 S Ct 486). However, petitioners do not seek remittal but rather urge that we retain jurisdiction, and we do so in the interest of judicial economy (*Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn.,* 86 AD2d 901, 902-903, *lv denied* 57 NY2d 601).

Turning then to the merits, we have concluded that the PSC's determination should be confirmed. Contrary to petitioners' arguments, the question of whether the definition of usable space in section 119-a requires the inclusion or exclusion of the neutral space and whether "wires and cables" in that definition refer only to *horizontal* lines is not one of pure statutory reading and analysis. Indeed, the very arguments advanced by petitioners before us, the PSC and the ALJ demonstrate that fair consideration of these issues cannot be had without reference to extensive information contained in the record on various technical matters and concerning customary industry practices with respect to the use of utility poles, including, *inter alia,* the purpose and proper application of the neutral space requirements of the NESC, the degree to which utilities are permitted to and actually use the neutral space for revenue producing attachments, the extent of practical restrictions on use of portions of utility poles apart from NESC requirements, and whether CATV should be charged with a greater portion of the pole than the 2 or 3 inches of the actual width of the cable attached thereto. Each of the disputants introduced voluminous evidence at the hearings on these and other issues, including expert testimony and field surveys. Therefore, the instant case falls well within the class of cases "[w]here the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation

of factual data and inferences to be drawn therefrom" in which "courts regularly defer to the governmental agency charged with the responsibility for administration of the statute" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459).

The PSC's interpretation of the statute to require inclusion of the neutral space within total usable space cannot be said to lack rationality. By statutory definition, usable space includes the space available for the attachment of "wires" (Public Service Law § 119-a). Since the NESC permits the attachment of vertical wires running to such things as lights and transformers within the neutral space, this space literally meets the statutory criterion for usable space. Nor is the PSC's ruling inconsistent with the obvious over-all purpose of the statutory ceiling on rates for CATV utility pole use, namely, to insure that CATV would not be charged more than that share of the utility's recovery of operating costs for poles and their investment therein in direct proportion to the percentage of its use of the pole. Under this rationale, CATV should not be charged, in effect, for pole space which is usable and actually used by utilities for other revenue producing purposes.

A further factor supportive of the PSC's disposition is its conformity with administrative and judicial construction of the Federal statute upon which Public Service Law § 119-a was based. As previously noted, Congress resolved the CATV-utility controversy over regulation of utility pole use charges by enacting Federal Communications Act § 224. Section 224 provided for nationwide regulation of pole attachment rates by the FCC to commence within six months of the date of enactment, except for States that could certify to having taken over such regulation, with due consideration for the interest of consumers of CATV as well as of consumers of utility services (47 USC § 224 [b], [c]). Additionally, section 224 set forth a minimum rate standard for such use based upon recovery of actual costs of attachment of CATV and a maximum rate standard based upon recovery of that portion of pole operating expenses and return on pole investment equivalent to the percentage of actual CATV use of the total usable space of the pole (47 USC § 224 [d] [1]). New York quickly responded to the Federal statute's invitation to preempt intrastate regulation of pole attachment rates by enacting Public Service Law § 119-a (*see,* Executive Department Memorandum, 1978 McKinney's Session Laws of NY, at pp 1779-1780). The New York statute also adopted the substance of the formulae for determining the minimum and maximum rates contained in the Federal act and similarly defined usable space in terms of the portion of the pole which is available for the

attachment of wires and cables, although it omitted the phrase "and associated equipment" contained in the Federal definition. In construing section 224, the FCC rejected the contention by various utilities that neutral space should be excluded from total usable space (*Matter of CATV Pole Attachments Regulation,* 77 FCC2d 187, 190-191, *supra*). Upon judicial review, the FCC's determination was upheld, the court heavily relying on legislative history (*Monongahela Power Co. v Federal Communications Commn.,* 655 F2d 1254, 1255-1256, *supra*).

Although each of the parties here has invoked various canons of statutory construction in support of its position as to whether neutral space should be included or excluded, we believe that the principle which most clearly reflects the intent of the Legislature, given the circumstances under which Public Service Law § 119-a was enacted, is that the authoritative legislative history and judicial and administrative interpretation of a statute upon which New York legislation was modeled is highly persuasive and that uniformity in interpretation is desirable (*Matter of Lazarus [Haxton & Son — Corsi]*, 268 App Div 547, 553-554, *affd* 294 NY 613; *see, Matter of Marx v Bragalini,* 6 NY2d 322, 331; *Matter of New York State Labor Relations Bd. v Holland Laundry,* 294 NY 480, 492-493). That section 119-a omits "and associated equipment" from the Federal definition of usable space is of little consequence. The fact of the matter is that neutral space is available for *wires* and attachments not associated with CATV equipment. Moreover, the Legislature chose to incorporate the substance of the Federal minimum and maximum rate standards, rather than to copy them verbatim. There are accordingly several variations from the sentence structure and omissions of words found in the Federal statute, but neither these differences nor the legislative history of section 119-a in any way indicates that different substantive results were intended. Likewise, we are unimpressed with the argument that if neutral space is included within usable space, in effect the entire pole space above minimum grade level becomes usable space, thus rendering the balance of the definition of usable space superfluous. The same can be said with respect to the Federal definition of usable space. No doubt, the drafters of the statutory definition intended to leave open to future regulatory agency determination whether, for safety reasons or otherwise, a portion of the pole above the minimum grade was not usable for any attachment purposes and, hence, the additional language was included within the definition.

For all of the foregoing reasons, the PSC's determination should be confirmed.

MAHONEY, P. J., CASEY, MIKOLL and HARVEY, JJ., concur.

Determination confirmed, and petitions dismissed, with costs.