In the Matter of OCCIDENTAL CHEMICAL CORPORATION, Respondent, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Appellants.

Third Department, February 20, 1986

150

APPEARANCES OF COUNSEL

*David E. Blabey (Timothy P. Sheehan* of counsel), for Public Service Commission of the State of New York, appellant.

*LeBoeuf, Lamb, Leiby & MacRae (Grant S. Lewis* and *Nancy I. Ruskin* of counsel), for Niagara Mohawk Power Corporation, appellant.

*Whiteman, Osterman & Hanna (Michael Whiteman* of counsel), and *Sutherland, Asbill & Brennan (Earle H. O'Donnell* of counsel), for respondent.

**OPINION OF THE COURT**

LEVINE, J.

Petitioner owns and operates a facility adjoining its chemical plant in Niagara Falls which produces both electric and steam power from the municipal waste materials of nearby towns and cities. In 1982, petitioner applied to respondent Public Service Commission (PSC) for a ruling that respondent Niagara Mohawk Power Corporation (Niagara Mohawk) was required to purchase petitioner's energy production from that facility at the rate of 6 cents per kilowatt hour, as provided under Public Service Law § 66-c (1). That section was originally enacted into law on June 26, 1980 (L 1980, ch 553, § 7) as part of a legislative program expressly designed "to encourage the development of alternate energy production * * * [and] * * * co-generation facilities in order to conserve our finite and expensive energy resources and to provide for their most efficient utilization" *(ibid.)*. Chapter 553 accomplished these purposes by (1) removing virtually all forms of State and local regulatory control (including fiscal and health and safety regulation by the PSC) over qualified cogeneration and alternate energy production facilities and transferring public health and safety regulation of such facilities to the State

Energy Office (L 1980, ch 553, § 1, adding Energy Law art 21), and (2) mandating that the PSC require public utility steam and electric corporations to "purchase or wheel electricity or useful thermal energy" from such alternate energy producing facilities and to provide supplemental or back-up power to such facilities, all at "just and reasonable rates" to be set by the PSC (Public Service Law § 66-c [1] [a], [b], added by L 1980, ch 553, § 7).

Chapter 553 (§§ 1, 3) statutorily defined the eligible cogeneration and alternate energy production facilities in terms of their having an electric generating capacity (up to 80 megawatts), their respective methods and types of energy production, and their not being otherwise engaged in the business of producing or selling electricity (Energy Law § 21-106 [1] [a], [b]; Public Service Law § 2 [2-a], [2-b]).

Extensions and modifications of the foregoing legislative program were enacted the succeeding year (L 1981, ch 843). First "small hydro" facilities, defined in terms of similar electric-generating capacity (Energy Law § 21-106 [1] [c]; Public Service Law § 2 [2-c]), were made eligible for the benefits conferred on cogeneration and alternate energy production facilities. Second, fiscal and health and safety regulatory authority over the facilities was restored to the PSC except that, for all such facilities "constructed and placed in operation on or after June twenty-sixth, nineteen hundred eighty" (the date of enactment of the original program), public health and safety regulation remained with the State Energy Office (L 1981, ch 843, § 1, amending Energy Law § 21-106 [4]). Finally, of direct pertinence to the instant case, for facilities "developed on or after June twenty-six, nineteen hundred eighty", the PSC was directed to establish a minimum price of 6 cents per kilowatt hour for mandatory long-term contracts for the purchase of power from such facilities by electric and steam utilities (L 1981, ch 843, § 9, amending Public Service Law § 66-c [1] [a]).

The facts concerning the development of petitioner's Niagara Falls energy-producing facility are not in dispute. Construction started in 1978 after petitioner entered into a contract to build the plant for a projected cost of some $65 million. At the time of the original enactment of Public Service Law § 66-c on June 26, 1980, some $70 to $80 million had been spent on what was ultimately to be a total cost of the project of some $100 million. The facility was not ready for testing until July 1980, after which additional work was

necessary before the plant was capable of producing electricity for sale to utilities on September 18, 1980. All parties concede that, as finally constructed, petitioner's facility qualifies as both a cogeneration and an alternate energy production facility as those phrases are defined in the applicable sections of the Energy Law and the Public Service Law.

The dispositive issue before the PSC, as well as on appeal, is whether petitioner's facility was "developed" on or after the June 26, 1980 date of enactment of the original alternate energy legislative program, in order to be entitled to receive the mandatory 6 cent per kilowatt hour price for selling energy to Niagara Mohawk. Niagara Mohawk contended before the PSC that, since construction of petitioner's facility started before the critical date, it was not "developed" on or after June 26, 1980, and hence was not eligible for the minimum rate. Petitioner's position was and continues to be that "developed" means capable of producing useful quantities of electricity, which did not occur with respect to its facility until September 1980 at the earliest. The PSC rejected each of these extremes and adopted a flexible, middle position. In its declaratory ruling, the PSC interpreted "developed" to mean "substantially designed and constructed". Applying such factors as the relative share of total cost expended and relative state of completion of the project by the statutory cutoff date, the PSC concluded that petitioner's facility was developed before June 26, 1980 and was thus not entitled to receive the minimum 6 cent rate.

Petitioner then brought this CPLR article 78 proceeding to review the PSC's determination. Special Term annulled. Relying principally on the previously discussed reference to the manner and type of production of energy in the statutory definition of cogeneration facility, Special Term inferred that petitioner's plant was not a "facility" until it actually produced electricity in September 1980, and hence was not developed before the June 26, 1980 cutoff date. Respondents appealed. Initially, this court withheld decision and remitted to Special Term for further consideration in light of *Matter of Consolidated Edison Co. v Public Serv. Commn.* (98 AD2d 377, *mod* 63 NY2d 424), wherein, *inter alia,* this court invalidated the 6 cent rate provision of section 66-c on the ground that it was preempted by the Federal Public Utility Regulatory Policies Act of 1978 (Pub L 95-617) *(see, Matter of Occidental Chem. Corp. v Public Serv. Commn.,* 98 AD2d 945). When the Court of Appeals reversed that portion of our decision in

*Matter of Consolidated Edison Co. v Public Serv. Commn.* (63 NY2d 424, 438, *supra),* Special Term granted a renewal of its prior judgment in favor of petitioner. Both judgments are now before us on appeal.

Respondents essentially urge two grounds for reversal: (1) that Special Term erred in failing to give deference to the PSC's administrative interpretation of the statute; and (2) that Special Term's interpretation conflicts with the statutory purpose, as evidenced by the expressed legislative policy and the legislative history of the 1980 and 1981 enactments. Regarding the first of these points, both respondents invoke the familiar canon of administrative law which requires judicial deference to the construction of a statute by the governmental agency to whom the Legislature has delegated responsibility for the implementation and administration of the statute, when construction, enforcement or application of the law entails knowledge or experience in operational practices or the evaluation of factual data (citing *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459).

The statute under consideration here, however, evinces no legislative intent to delegate broad administrative responsibility upon the PSC with respect to regulation of alternate energy producers. Indeed, the thrust of this legislative program and one of its main objectives consisted of removing from the PSC its normal utility regulatory authority as to the subject facilities by (a) drastically restricting or transferring administrative supervision to the State Energy Office, and (b) eliminating, through the mandatory minimum rate, the PSC's traditional role of setting just and reasonable rates for the purchase of power. As to the key elements of this legislative program to foster the growth of alternate energy-producing facilities, namely, mandatory purchase and wheel of electricity, the mandatory minimum rate and the removal of burdensome regulation, the legislative charge to the PSC in implementing the statute was either erased or diminished to the point of being virtually ministerial. Under these circumstances, it cannot be assumed that the Legislature intended to grant the PSC any broad administrative discretion to construe "developed" and thereby restore to itself the very regulatory power of which it was divested.

Moreover, there is nothing in the use of the word "developed", nor in its statutory context nor its most authoritative legislative history, to suggest that the term was used in any technical sense, the administrative application of which would

require specialized knowledge or expert factual analysis *(cf. Matter of Central Hudson Gas & Elec. Corp. v Public Serv. Commn.,* 108 AD2d 266, 269). As previously noted, the stage of completion of petitioner's facility on June 26, 1980 required no evaluation and was not in dispute. "Developed", then, was merely employed by the drafters of the statute in one or more of its common meanings, the most appropriate of which has to be gleaned from the statutory framework and available evidence of the statutory purpose. The making of that selection thus only calls for statutory reading and analysis to ascertain the legislative intent; therefore, the construction by the administrative agency is entitled to less weight, and no deference whatsoever if found to be inconsistent with the words and purposes of the statute *(Matter of Trump-Equitable Fifth Ave. Corp. v Gliedman,* 57 NY2d 588, 597; *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459, *supra).*

In arguing alternatively that Special Term's construction of "developed" in fact conflicts with the purpose of this legislative energy program, respondents rely almost exclusively on the statement of policy in the Laws of 1980 (ch 553, § 7) "to encourage the development" of the subject facilities, and on some legislative history of the 1981 enactment contained in the Governor's bill jacket consisting of official letters of support for adoption of the 6 cent minimum rate. Those letters expressed the need to enhance the ability of developers of new alternate energy facilities to attract investment resources through that means of assuring a stable, profitable return. From these premises, respondents contend that the purpose of both the 1980 and 1981 laws was to encourage the creation of new facilities that otherwise might not have been developed. They urge that, since petitioner's facility was already in an advanced stage of completion before the date of the 1980 enactment, Special Term's interpretation creates an unintended "windfall", rewarding petitioner through the 6 cent minimum rate for developing its facility independently of any incentives from the 1980 and 1981 legislative program.

Respondents' arguments would be persuasive, but for the fact that, even under the PSC's determination and by reason of other provisions of this legislative program on alternate energy producing sources, facilities undertaken without the encouragement of the statutory benefits are nevertheless similarly rewarded with the same "windfall". Thus, under the PSC's interpretation of "developed", a facility started on or after June 26, 1980, but less than substantially constructed, is

eligible for the 6 cent rate. However, it seems self-evident that developers of costly, complex alternative energy production plants such as petitioner's, if at all started on or after the statutory cutoff date, would have made irrevocable planning and financial decisions and commitments well before receiving the encouragement supplied by the initial 1980 legislation. Additionally, small hydro facilities were first added to the list of eligible alternate energy producers by the 1981 law, and that law also equally afforded them the benefit of the mandatory minimum rate if developed on or after the date of enactment of the 1980 statute. And all three types of qualifying facilities "constructed and placed in operation" on or after June 26, 1980 were benefited in only being subject to the public health and safety regulatory authority of the State Energy Office. Each of these provisions reward facilities developed without the incentives enacted under the Legislature's 1980 and 1981 program.

Simply put, all the various provisions of the subject legislation which gave retroactive effect to the statutory benefits awarded alternate forms of energy producers belie the narrow purpose attributed to the legislation by respondents, and suggest that the entire program was designed, not only to encourage the creation of new facilities, but also the full, productive use of such facilities. This interpretation of purpose is supported by the statement of over-all policy in the 1980 bill "to conserve our finite and expensive energy resources and to provide for their most efficient utilization" (L 1980, ch 553, § 7, adding Public Service Law § 66-c [1]). It is also consistent with the statement of State energy policy contained in the Energy Law "to foster, encourage and promote the prudent development and *wise use*" (emphasis supplied) of the very types of alternate means of energy production at issue here (Energy Law § 3-101 [5]). Thus, awarding petitioner the benefit of the minimum 6 cent rate is not at all inconsistent with the statutory policy of encouragement of full, productive use of its facility.

We have also concluded that petitioner's entitlement to the minimum 6 cent rate is consistent with the statute's use of the term "developed". Among its various meanings, Webster's Third New International Dictionary (618 [unabridged 1981]) defines "develop" as "to make actually available or usable", as in to develop "resources". This definition, in our view, aptly fits employment of the term in a statutory scheme addressed to the development of novel energy production resources. The

legislative use of the past tense of develop is also significant. The original 1980 enactment was entitled, "AN ACT to amend the energy law and public service law, in relation to energy *supply* and *production*" (L 1980, ch 553; emphasis supplied). Thus, this and other expressions of legislative purpose already discussed indicate clearly that the intent was to enhance the *fruition* of available, productive alternate energy resources, not merely to enhance their commencement or the process of their development, as both respondents have suggested. Ascribing meaning to the use of the past tense of develop, as *having been made* available or useful, also comports with the common element of the statutory definitions of all three types of qualifying facilities in terms of attainment of a useful electric generating capacity of up to 80 megawatts. Encouragement, by awarding the minimum 6 cent rate, of full productivity of those more modern, technologically advanced facilities which achieved that useful electric generating capacity on or after June 26, 1980 therefore conforms to the over-all statutory purpose of the 1980 and 1981 legislative program and construes "developed" consistently with other statutory language (see, *Matter of Trump-Equitable Fifth Ave. Co. v Gliedman*, 57 NY2d 588, 595, *supra*).

Since, on the undisputed facts, petitioner's Niagara Falls facility had not attained any electric generating capacity before June 26, 1980, Special Term's annulment of the PSC's contrary determination should be affirmed.

MAHONEY, P. J., KANE, MIKOLL and HARVEY, JJ., concur.

Judgments affirmed, with one bill of costs.