In the Matter of OCCIDENTAL CHEMICAL CORPORATION, Respondent, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Appellant.

Third Department, February 20, 1986

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Joel F. Spitzer, Peter H. Schiff* and *Douglas H. Ward* of counsel), for appellant.

*Whiteman, Osterman & Hanna (John Hanna* of counsel), for respondent.

### OPINION OF THE COURT

LEVINE, J.

Petitioner, a manufacturer of agricultural and industrial chemicals and plastics, operated for some 20 years, until the mid-1970s, a 15-acre landfill (the Hyde Park site) in the Town of Niagara, Niagara County, as a dump for the chemical waste materials (some of high toxicity) from its production processes. By 1971, the danger of the site as a local health hazard and its potential pollutant effect on the Niagara River was recognized and became a subject of great public concern. The Niagara County Health Department requested that dumping operations cease, and, in 1975, the site was closed. However, the danger remained of migration of previously deposited hazardous wastes through the percolation of ground and surface water in which the toxic substances became suspended (called "leachate"). Remedial and preventive measures were taken by petitioner, including (by 1978) the installation of a drain tile system and two lagoons for the collection and

containment of the leachate and its eventual neutralization. These means were undertaken in consultation with respondent, the State Department of Environmental Conservation (DEC).

Despite the foregoing measures, the Federal Environmental Protection Agency (EPA) concluded that the Hyde Park site still constituted a danger to public health and the environment and, accordingly, in 1979, brought suit in the United States District Court for the Western District of New York under, *inter alia,* Resource Conservation and Recovery Act of 1976 § 7003 (42 USC § 6973) (RCRA) for broad injunctive relief and monetary damages. Interested State agencies, including DEC, were joined as parties. In 1982, a comprehensive settlement and consent decree (the Federal consent decree or settlement) was approved by the District Court *(United States v Hooker Chems. & Plastics Corp.,* 540 F Supp 1067). The settlement provided for (1) petitioner's undertaking a remedial program estimated to cost $20 million to collect the leachate and maximize prevention of its migration from the site[1] by temporarily using the preexisting lagoons and later replacing them with permanent storage facilities, the hard surfacing of the contaminated area and continuous testing of the perimeter of the site; (2) the payment by petitioner of $1.5 million to the State to cover the cost of monitoring and supervising petitioner's remediation program, of its legal expenses relating to the Federal litigation and to fund research and development of technology by DEC and the State Department of Health addressed to environmental and public health problems associated with the disposal of chemical wastes; (3) petitioner's periodic reporting of the amounts of leachate collected; and (4) a release of petitioner by "all governmental parties" from, *inter alia,* all future claims under statutes or regulations "whose provisions have as their purpose, in whole or in part, the protection of human health or the environment", arising out of activities petitioner "is required to undertake in compliance with the Judgment".

In 1983, the Legislature enacted a fee system to provide for recovery from regulated entities of a portion of DEC's expenses in administering certain specific regulatory programs (L 1983, ch 15, § 53, adding ECL art 72). Among the named DEC programs for which fees are imposed upon entities regulated

---

1. The Federal settlement contemplates a 90% recovery rate *(United States v Hooker Chems. & Plastics Corp.,* 540 F Supp 1067, 1078).

thereunder is the State hazardous waste program (ECL 72-0401, 72-0402). The State hazardous waste program is defined as those regulatory activities of DEC under ECL article 27, titles 3, 7, 9 and 11 (ECL 72-0401 [12]). Fees are assessed upon generators of hazardous waste according to a schedule of the amounts generated upon the general operation of a treatment, storage or disposal facility for which a permit is required under ECL article 27, title 9 (hereinafter referred to as title 9, enacted by L 1978, ch 639) and for the handling of hazardous waste in certain specified ways, including through the use of surface impoundments (ECL 72-0402 [1], [2]).

After petitioner filed a report with DEC (as required under the Federal consent decree) indicating its collection of some 1,400 tons of hazardous waste at the Hyde Park site, DEC assessed a total of $38,000 in annual fees pursuant to the foregoing provisions of ECL article 72. Petitioner then sought a declaratory ruling from DEC that it was not liable for the fees on two grounds: (1) that, as an inactive site, DEC's sole regulatory jurisdiction applicable to the Hyde Park landfill is pursuant to ECL article 27, title 13 (the Inactive Hazardous Waste Disposal Act of 1979, added by L 1979, ch 282, hereinafter referred to as title 13); since regulation under title 13 is omitted from those programs for which fees are assessable under ECL article 72, there is no statutory authority for levying the assessment, and (2) that the entire fee assessed against petitioner is based upon the collection, storage and treatment of hazardous waste at the Hyde Park site; since all such activities are required under the terms of the Federal consent decree, the entire fee is barred under the release provision of that decree.

After DEC issued its ruling rejecting these contentions, petitioner sought judicial review through the instant CPLR article 78 proceeding. Special Term annulled DEC's determination, adopting both of petitioner's grounds for challenging the imposition of the fee.

In ruling that DEC lacked statutory authority to assess a fee because title 13 programs were omitted from those to be financed under ECL article 72, Special Term rejected DEC's argument that title 9 also imposed regulatory responsibilities over petitioner's site. The court construed title 9 to apply only to active, ongoing hazardous waste disposal sites. We disagree. Although title 13 obviously represents the primary legislative program for regulation of inactive hazardous waste sites, we have concluded that DEC could rationally construe title 9 as

comprehending at least some of the occurrences and activities presently taking place at the Hyde Park site.[2]

Support for DEC's construction of title 9's applicability to regulation of petitioner's Hyde Park site can be found in the language of its provisions. The term "disposal", for title 9 regulatory purposes, includes the "leaking" of hazardous waste materials "or any related constituent thereof" which may enter the environment (ECL 27-0901 [2]). The "leaking" of any related constituent of hazardous materials, as opposed to the "discharging" thereof, a term employed in other regulatory and cost-recovery provisions of the ECL (ECL 17-0501, 72-0602), connotes a passive. ecologically harmful occurrence not necessarily as a direct result of any present human activity *(cf. Matter of Bohlander v Williams,* 114 AD2d 540; *State of New York v Schenectady Chems.,* 103 AD2d 33, 36). Title 9 was enacted in 1978 in response to the Federal RCRA *(see,* ECL 27-0900; Executive Department memorandum, 1978 McKinney's Session Laws of NY, at 1836). RCRA's identical definition of "disposal" to include "leaking" (42 USC § 6903 [3]) has been authoritatively construed to apply to the generation of leachate at an inactive hazardous waste disposal site *(United* States v Waste Indus., 734 F2d 159, 164-165). Moreover, passively produced leachate is included in the definition of hazardous waste under DEC's regulations promulgated pursuant to title 9 (6 NYCRR 366.1 [d] [4]; 360.1 [d] [54]), and the comparable Federal regulations adopted pursuant to RCRA (40 CFR 261.3 [c] [2]; 260.10).

Finally, with respect to the issue of whether title 9's regulatory program covers any present aspect of the Hyde Park site, although the site is now closed, environmentally significant operations are taking place on the site which fall within the explicit regulatory ambit of provisions of title 9. This includes the storage, i.e., containment *(see,* ECL 27-0901 [8]; 27-0913 [1]), and treatment *(see,* ECL 27-0901 [10]; 27-0913 [1]) of leachate. Obviously also, an owner of a facility in which leachate is being contained is in "possession" of that hazardous waste, which title 9 prohibits (and thus regulates) unless authorized by DEC (ECL 27-0914 [1]).

Thus, there is ample basis in the express language of title 9

---

2. We note that, as to the issue of DEC's statutory authority to regulate current activities at the site under title 9, whether such activities may have been engendered by the Federal consent decree is not relevant.

from which DEC could rationally infer a legislative charge to regulate and supervise the current activities at the Hyde Park site, independently of the more comprehensive program of regulation of inactive sites under title 13. Petitioner cites two sources of support for its position that title 9 has no application to an inactive site. The first of these is derived from the statement of legislative findings of the need for new legislation on inactive sites, contained in the subsequent enactment of title 13 (L 1979, ch 282, § 1). Our reading of these legislative findings reveals, at best, an ambiguity as to whether the Legislature found an *absence* of prior regulatory law applicable to inactive sites, or merely an *inadequacy* of prior law, requiring further legislation to provide *"additional* powers * * * to enable" State regulators to deal fully with the special problems connected with inactive sites (L 1979, ch 282, § 1; emphasis supplied). The second source of support for petitioner's contention that title 9 has no application to an inactive site is the statement of legislative purpose in title 9 to regulate the management of hazardous waste in a manner "consistent with" the Federal RCRA *(see,* ECL 27-0900). Petitioner quotes from the preface of the Federal regulations under RCRA in which the Federal act is construed not to apply to inactive sites (45 Fed Reg 33068 [1980]). However, the RCRA (42 USC § 6929) specifically abjures a construction of its provisions "to prohibit any State * * * from imposing any requirements * * * *more stringent* than those imposed by [the Federal] regulations" (42 USC § 6929; emphasis supplied). Similarly, ECL 27-0900 in title 9 only prohibits DEC from regulation "in a manner less stringent than provided in RCRA" (ECL 27-0900). Thus, neither RCRA nor title 9, its New York counterpart, expressly prohibits a more expansive arrogation of regulatory authority by DEC than EPA has assumed under RCRA. Moreover, petitioner's arguments based on a claimed legislative intent not to regulate inactive sites under title 9 ignore the previously discussed current activities at the Hyde Park site, to which title 9 directly applies.

In summary on this issue, DEC's construction of title 9 making it applicable to what is presently taking place at the Hyde Park site has not been shown by petitioner either to conflict with the express language of that statute or its purpose. Since there is no other evidence that the Legislature intended, in title 9, to restrict the otherwise broad, discretionary, administrative powers awarded DEC to implement State environmental policy *(see, e.g.,* ECL 3-0301), DEC's construc-

tion of title 9 should control *(see, Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459; *Matter of Howard v Wyman,* 28 NY2d 434, 438; *cf. Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 57 NY2d 588, 595; *Matter of Occidental Chem. Corp. v Public Serv. Commn.,* 114 AD2d 149).

It follows from the foregoing that since the activities and occurrences at petitioner's Hyde Park site fall within the regulatory program of title 9, DEC has statutory authority to impose fees under ECL article 72, title 4 unless barred by the release of State claims against petitioner contained in the Federal consent decree. Special Term held that the release precluded the imposition of all fees on petitioner under ECL article 72. As previously described, under the settlement of the Federal litigation, and in consideration of petitioner's commitment to an expensive remediation program and its payment of $1.5 million, the State released petitioner from all future claims, pursuant to laws whose purpose, in whole or in part, is the protection of human health and the environment, arising out of petitioner's activities required under the consent decree. The stated purpose of ECL article 72 is, *inter alia,* "to further strengthen the state's capabilities to achieve its environmental quality objectives" (ECL 72-0101). Certainly, ECL article 72 thus represents a law whose purpose at least in part is to protect the environment.

Language in the Federal consent decree releasing petitioner of *"[a]ll* claims which may arise * * * out of activities [petitioner] is required to undertake in compliance with the Judgment", is to be fairly construed according to the words used by the parties, their purpose and other provisions of their settlement agreement *(see, Delaney v County of Westchester,* 90 AD2d 819, 820, *appeal dismissed* 59 NY2d 763). The obvious objective of petitioner and the governmental parties to the Federal litigation was to insure that, if petitioner made the stipulated payment of $1.5 million and otherwise fulfilled its settlement obligations, it would not be presented with another bill based upon any affirmative acts taken in compliance with the consent decree. Moreover, the payment of the $1.5 million was expressly made to cover not only the State's administrative and legal costs of obtaining the consent decree and of future enforcement of the terms thereof, but also to fund DEC's research and developmental technology to deal with the general problem of chemical waste.

The foregoing factors militate in favor of a construction of the release to cover fees imposed under ECL article 72, to the

extent that the incidence of the assessment of the fee is an activity petitioner was obliged to undertake by virtue of the Federal consent decree. This applies to the base facility fee of $6,000 and the special facility fee of $12,000 that DEC has levied against petitioner. The base facility fee clearly is grounded in the leachate collection, storage and treatment system petitioner is required to maintain under the Federal consent decree.[3] A special facility fee is based upon petitioner's use of the lagoons, i.e., "surface impoundments" (ECL 72-0402 [2] [b] [iv]), for its leachate storage and treatment processes at the Hyde Park site. The temporary, continued use of the lagoons is also called for under the Federal consent decree.

We reach a contrary conclusion with regard to the $20,000 fee imposed upon petitioner as a generator of leachate (ECL 72-0402 [1] [d]). Petitioner argues that its present *collection* of leachate is the basis for the generator's fee, and is therefore barred under the release as a claim arising from an activity admittedly called for by the decree. The generator's fee, however, is not levied upon the collection of hazardous waste. A "generator" is defined as a person "by site, whose act or process produces hazardous waste or whose act *first causes* a hazardous waste to become subject to regulation" (ECL 72-0401 [5]; emphasis supplied). Undisputably, leachate is being generated by natural processes at the Hyde Park site. It is equally clear that petitioner's prior acts of burying its chemical waste by-products at the site *first caused* the generation of leachate to become the subject of regulation. Thus, it is petitioner's previous dumping of chemical waste now generating leachate, not petitioner's present *collection* of leachate, which is the event giving rise to the imposition of the fee. The fact that, in petitioner's case, the quantity of leachate collected is used to determine the amount of the fee, does not affect this conclusion. Even under the best scenario, petitioner is not collecting 100% of the leachate generated at the Hyde Park site *(see,* n 1, *supra).*

Petitioner also points to another provision of the Federal settlement (para 11 [b] [ii]) as absolving it from a generator's fee, wherein petitioner is released from State claims relating

---

**3.** In so ruling, it is unnecessary for us to address whether, as an operator of a treatment, storage and disposal facility, petitioner's obligation under title 9 to obtain a permit was waived by the State in entering into the Federal settlement. DEC has not heretofore attempted to impose the permit requirement against petitioner.

to the migration of waste substances from the site. However, a reading of this clause of the settlement clearly indicates its inapplicability to postdecree migration of leachate.

For all of the foregoing reasons, we disagree with Special Term's conclusion that petitioner's fee liability under ECL article 72 is entirely barred by the release provision of the Federal consent decree and, therefore, the judgment must be modified accordingly.

MIKOLL, J. (dissenting). We respectfully dissent. The statutes to be interpreted herein deal with determining DEC's jurisdiction to impose fees under the Laws of 1983 (ch 15). Their interpretation presents a question of statutory reading and, therefore, special deference need not be afforded to the agency's interpretation in such instances *(Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459).

Fees for the State's hazardous waste program are governed by ECL article 72, title 4. The statute provides that the program applies to DEC's activities related to hazardous waste regulations under ECL article 27, titles 3, 7, 9 and 11. It is to be noted that ECL article 27, title 13, which regulates inactive hazardous waste disposal sites, is not included. It is conceded that petitioner's site is an inactive one.

The Governor's memorandum and legislative findings rebut the interpretation that DEC now attempts to find in the legislative history of ECL article 72, title 4 to support its imposition of fees. The omission of ECL article 27, title 13 from the hazardous waste fees speaks clearly to program legislative intention. We note that legislative findings in enacting title 13 state: "Article twenty-seven of the environmental conservation law * * * provides for the management and control of wastes *now being generated* and sites *now being used* for disposal of such wastes" (L 1979, ch 282, § 1; emphasis supplied). The Governor's memorandum approving the bill stated: "Present state law is directed at hazardous wastes now being generated and disposed of. It does not address directly the need to identify sites no longer used" (Governor's program memorandum, 1979 NY Legis Ann, at 185). In passing ECL 27-0918, the Legislature stated: "The legislature hereby finds and declares that all owners and operators of facilities for the treatment, storage and disposal of hazardous wastes should establish adequate financial assurances and guarantees so that sufficient funds will be *available* to fully pay for the costs of site closure" (L 1982, ch 855, § 1; emphasis supplied).

We conclude that ECL 27-0918 applies to sites currently regulated which will be closed in the near future, and ECL 27-1313 applies to sites which were never regulated when active, have been closed, and were subsequently discovered to be dangerous inactive sites. We therefore conclude that petitioner was not subject to regulation under ECL article 27, title 9, and it follows that activity at petitioner's site does not fall under the meaning of "generator" as that term is used in ECL article 72, title 4. For the same reason, petitioner is also not required to obtain a permit for the lagoons it maintains to catch and retain leachate. Having concluded that petitioner is not subject to ECL article 27, title 9, it is not necessary to address other issues raised herein as to the implications of the settlement agreement vis-à-vis the imposition of regulatory fees. Accordingly, the judgment should be affirmed.

MAHONEY, P. J., and KANE, J., concur with LEVINE, J.; MIKOLL and HARVEY, JJ., dissent and vote to affirm in an opinion by MIKOLL, J.

Judgment modified, on the law, without costs, by reversing so much thereof as annulled the determination by respondent that petitioner was liable to pay an annual fee as a "generator" of hazardous waste, and, as so modified, affirmed.