In the Matter of F.W.E. STAPENHORST, INC., Respondent, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Appellants.

Third Department, May 18, 1989

### APPEARANCES OF COUNSEL

*William J. Cowan (Jonathan D. Feinberg* of counsel), for Public Service Commission of the State of New York, appellant.

*Huber, Lawrence & Abell (Kenneth M. Jasinski* and *Sarah Barish-Straus* of counsel), for New York State Electric & Gas Corporation, appellant.

*Read & Laniado (Craig M. Indyke* of counsel), and *Melvin & Melvin* for respondent.

### OPINION OF THE COURT

HARVEY, J.

On November 9, 1978, the Public Utility Regulatory Policies Act (hereinafter PURPA) became effective (16 USC § 2601 *et seq.).* PURPA was designed to encourage the development of small hydroelectric production facilities by requiring utility companies to purchase the newly created hydroelectric power at just and reasonable rates. On that same day, petitioner entered into a contract with respondent New York State Electric & Gas Corporation (hereinafter NYSEG) whereby petitioner acquired the right to develop, own and operate a

hydroelectric plant in the Town of Milford, Otsego County. Under the terms of the contract, petitioner was to sell the electric energy produced at its plant to NYSEG at a price of 3 cents per kilowatt hour. The contract contained a price escalation cap by which NYSEG would pay no more than 5 cents per kilowatt hour until August 1987 and no more than 6 cents per kilowatt hour for the remainder of the contract's existence.

Following execution of the contract, petitioner began construction of its facility which was finally completed in August 1980. Notably, in 1980, legislation was passed in New York seeking to support the development of small generation facilities by requiring utility companies to purchase electrical output of certain facilities at reasonable rates to be determined by respondent Public Service Commission (hereinafter the PSC) (see, L 1980, ch 553, § 7). This law was codified as Public Service Law § 66-c. Thereafter, this statute was retroactively amended by Laws of 1981 (ch 843) to require the PSC to establish a minimum purchase rate of 6 cents per kilowatt hour for all qualifying energy-producing facilities and small hydroelectric plants developed on or after June 26, 1980.

Beginning in 1983, petitioner sought a voluntary contract rate revision with NYSEG due to its inability to meet its operational costs. When these attempts proved fruitless, it sought an order from the PSC in January 1987 to direct NYSEG to comply with Public Service Law § 66-c and establish a new contract rate of 6 cents per kilowatt hour. The PSC denied this request, concluding that it did not have the authority to reform the contract between petitioner and NYSEG. Thereafter, petitioner commenced this CPLR article 78 proceeding seeking to annul the PSC's determination and have the PSC order NYSEG to comply with Public Service Law § 66-c. Supreme Court granted the petition and this appeal by NYSEG and the PSC (hereinafter collectively referred to as respondents) ensued.

Since petitioner's hydroelectric facility was not operational until after June 26, 1980, respondents do not seriously dispute that the facility was "developed" after that date (see, Matter of Occidental Chem. Corp. v Public Serv. Commn., 114 AD2d 149, lv denied 68 NY2d 608), and would otherwise qualify for the 6-cent minimum rate set forth in Public Service Law § 66-c (1), which provides, in relevant part, that: "the commission shall require any electric corporation or steam corporation (a) to enter into long-term contracts to purchase or wheel electricity

of useful thermal energy from any alternate energy production, small hydro or co-generation facility under such terms and conditions as the commission shall find just and economically reasonable to the corporation's ratepayers * * * provided, however, *the commission shall establish a minimum sales price for such purchased electricity from any such facility developed on or after June twenty-six, nineteen hundred eighty, of at least six cents per kilowatt hour for each utility"* (emphasis supplied). Respondents strenuously contend, however, that Public Service Law § 66-c is inapplicable to this case. They contend that the Legislature did not intend for this statute to be utilized to affect preexisting contracts between facilities and utility companies. Respondents urge that the clear wording of the statute dictates that the 6-cent rate applies only to electricity that is purchased pursuant to a PSC-mandated contract.

■ We cannot agree. Respondents premise their arguments upon the assumption that the Legislature's intent in enacting the statute was solely to encourage the execution of new contracts between alternative energy producers and reluctant utilities and, thus, it could not apply to already existing contracts. However, this argument is substantially similar to the one made and rejected by this court in *Matter of Occidental Chem. Corp. v Public Serv. Commn.* (114 AD2d 149, *supra*). In that case, this court rejected the PSC's attempt to limit the application of Public Service Law § 66-c and held that a facility that was begun in 1978, but was not ready for use until after the June 26, 1980 statutory date, was entitled to the 6-cent rate. While the contract in *Occidental* was not, as in the case at bar, executed prior to the enactment of the statute, *Occidental* is nonetheless instructive since it explores the legislative purpose behind the enactment of Public Service Law § 66-c. Rather than limiting the legislative purpose to merely encouraging new PSC-approved contracts, it is clear that "the entire program was designed, not only to encourage the creation of new facilities, but also the full, productive use of such facilities" *(supra, at 155)*.

This purpose would be defeated if preexisting contracts such as the instant one were allowed to stand simply because they were executed prior to the enactment of the statute. Instead, we find that the 6-cent rate of Public Service Law § 66-c was intended to be applicable to preexisting facility contracts. As we recognized in *Occidental,* "it seems self-evident that developers of costly, complex alternative energy production plants

\* \* \* if at all started on or after the statutory cutoff date, would have made irrevocable planning and financial decisions and commitments well before receiving the encouragement supplied by the initial 1980 legislation" *(supra,* 114 AD2d, at 155).

■ Next, we reject respondents' contention that the rate standards required by Federal law do not apply to petitioner's facility. Pursuant to PURPA, the Federal Energy Regulatory Commission established rules for individual States to enforce the Federal rate standards that were to be established pursuant to PURPA and thereby encourage the development of small power production facilities. The rate to be paid to the facilities under this scheme depends upon the date construction of the qualifying facility was commenced. Significantly, those facilities which commenced construction after November 9, 1978 are "new capacity" and receive payment at a rate of at least equal to full "avoided costs" *(Allied Chem. v Niagara Mohawk Power Corp.,* 72 NY2d 271, 274, *cert denied* — US —, 109 S Ct 785), which are defined as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source" (18 CFR 292.101 [b] [6]). Here, since petitioner's facility was commenced after November 9, 1978, petitioner maintains that it qualifies as a "new capacity" facility and is eligible to receive payment of a rate at least equal to its full avoided costs.

Respondents dispute this assertion by pointing out that PURPA's regulations specifically allow qualifying facilities to contract for rates differing from those set by PURPA *(see,* 18 CFR 292.301 [b] [1]). These regulations also provide that PURPA does not affect "the validity of any contract entered into between a qualifying facility and an electric utility for any purchase" (18 CFR 292.301 [b] [2]). Respondents essentially contend, therefore, that since petitioner freely contracted with NYSEG for a different rate it should not now be allowed to take advantage of PURPA's rate and avoid the consequences of a bad bargain. This argument lacks merit. Before a qualifying facility can knowingly waive the required rate standards, those rates must first be made available to that facility. This did not happen here. The record shows that petitioner did not have the option of the required rate standards even though NYSEG was reasonably aware of the impending enactment of PURPA and indicated that it would

"certainly have an impact on [petitioner's] project". However, no apparent effort to conform with PURPA's rate schedule was made. Accordingly, petitioner's facility is qualified for the Federal rate standards.

■ The remaining arguments of respondents have been examined and have been found to be without merit. We note finally that, despite respondents' contentions otherwise, reformation of the 1978 contract rates does not impair NYSEG's contract rights in violation of the Contract Clause of the US Constitution. As a heavily regulated public utility, NYSEG has established no substantial impairment of its contract rights sufficient to overcome the overriding purpose and policy behind Public Service Law § 66-c *(see, Arkansas Elec. Coop. v Arkansas Pub. Serv. Commn.*, 461 US 375). In addition, petitioner's claims are not barred by laches or the Statute of Limitations.

MAHONEY, P. J., WEISS, LEVINE and MERCURE, JJ., concur.

Judgment affirmed, with costs.