OPINION OF THE COURT
Bellacosa, J.
 Petitioner F.W.E. Stapenhorst, Inc. (Stapenhorst), a *580 private hydroelectric producer, contracted in 1978 to provide electricity for 20 years to New York State Electric and Gas Corporation (NYSEG) at an agreed price structure. Stapenhorst has tried to reform the contract price to gain the incentive benefits of Federal and State price support programs. Appellants NYSEG and the New York Public Service Commission (PSC), through which the higher price is sought to be mandated, have resisted Stapenhorst’s efforts. Its litigation tactic, however, met with success in both lower courts. We take a different view and now reverse, concluding that the contract should not be reformed but should be left to be enforced as made.
Petitioner Stapenhorst and appellant NYSEG executed their contract on November 9, 1978, after more than two years of negotiation. Stapenhorst acquired the right to develop, own and operate a hydroelectric plant on the site of a former NYSEG facility on Goodyear Lake in the Town of Milford in Otsego County. NYSEG, in turn, agreed to purchase all the electricity produced at the to-be-developed facility for 20 years at a rate of 3 cents per kilowatt hour, with provisions for payment increases capped at 5 cents per kilowatt hour until August, 1987, and 6 cents for the approximately 11-year remainder of the contract. Significantly, Stapenhorst also sought and received an up-front lump-sum payment of $330,000 for research and development from NY-SEG, the Goodyear Lake Homeowners’ Association and various government entities. Finally, it was given a total 20-year local tax payment exemption.
The redeveloped Stapenhorst facility began producing electricity — but not profits — in 1980. Stapenhorst had underestimated the costs and expenses of rehabilitating and running the plant, and overestimated the amount of electricity the plant would generate. The combination of these business miscalculations led to a financial situation Stapenhorst was describing as "disastrous” by 1983. This appeal completes Stapenhorst’s third attempt to rescue itself from the agreed price for performing its contractual obligations.
First, in 1983, Stapenhorst tried, without success, to persuade NYSEG to increase the contract’s rate of payment. Next, in January 1987, Stapenhorst petitioned the PSC to reform the contract to incorporate the 6 cents per kilowatt hour minimum price prescribed in Public Service Law § 66-c (1). The Commission determined that the 1978 contract did not *581 qualify for the later-enacted statutory incentive benefit. Finally, Stapenhorst commenced this article 78 proceeding to annul that PSC determination and to compel the PSC to impose the statutory rate on NYSEG and, ultimately, on the ratepayers. Supreme Court granted the petition and directed the contract be reformed in accordance with Stapenhorst’s request for relief. The Appellate Division affirmed. We granted leave to appeal to both NYSEG and PSC and we now reverse.
Attention should be given first to Stapenhorst’s contention that Public Service Law § 66-c (1) requires reformation of the contract. The stated purpose of this statute, enacted in 1980, is the conservation of energy by "encouraging] the development of alternate energy production facilities * * * and to provide for their most efficient utilization” (Public Service Law § 66-c [1]). This statutory exhortation, as amended (L 1981, ch 843), is energized by this core provision: "The [Public Service Commission] shall require any electric or steam corporation (a) to enter into long-term contracts to purchase or wheel electricity or useful thermal energy from any alternate energy production, small hydro or co-generation facility under such terms and conditions as the commission shall find just and economically reasonable * * * provided, however, the commission shall establish a minimum sales price for such purchased electricity from any such facility developed on or after June twenty-six, nineteen hundred eighty, of at least six cents per kilowatt hour for each utility” (emphasis added).
The Stapenhorst facility was not operational until after June 26, 1980 and therefore was "developed” after the statutory qualifying date (cf., Matter of Occidental Chem. Corp. v Public Serv. Commn., 114 AD2d 149, 155, lv denied 68 NY2d 608). But this feature is far from dispositive of this case because the statute’s qualifying thresholds must first be satisfied. Initially, the PSC "shall require” utilities "to enter into long-term contracts” with alternate energy producers "under such terms and conditions as the commission shall find just and economically reasonable”. Then, the mandatory minimum price, found in a proviso clause, is limited to "such purchased electricity”; that is, purchased electricity referable to a contract the PSC initially "required” and whose terms it affected.
The contract before us was executed more than IV2 years before the enactment of Public Service Law § 66-c (1). The PSC, therefore, patently could not have "required” it pursuant to the then-nonexistent statute, nor could the Commission *582 have dictated any of the contract’s "terms and conditions,” including the conditioned statutory minimum payment. This contract was the product solely of private negotiations between two nonpublic entities. Indeed, it was initiated by Stapenhorst and predicated on its perceived potential for purely private profit. The plain meaning of the key unambiguous terms "shall require,” "to enter into long-term contracts,” and "such purchased electricity” compels the conclusion that the Stapenhorst-NYSEG contract utterly fails to qualify for the provisoed minimum price schedule of Public Service Law § 66-c (1) (see, e.g., Patrolmen’s Benevolent Assn. v City of New York, 41 NY2d 205, 208). The clincher in this regard is that entitlement to the 6-cent minimum hinges on the PSC establishing "terms and conditions” that are just and economically reasonable. Inasmuch as the PSC had no input and could have had none on the terms or condition of this contract, the statutory minimum price is plainly unavailable to Stapenhorst.
The courts below, in coming to the opposite conclusion, appear to have overread Matter of Occidental Chem. Corp. v Public Serv. Commn. (114 AD2d 149, lv denied 68 NY2d 608, supra). The Appellate Division held in Occidental that a power plant on which construction began before June 26, 1980, but which did not begin generating electricity until after that date, was a "facility developed on or after June twenty-six, nineteen hundred eighty” for the purposes of Public Service Law § 66-c (1). The central and first question here, however, is whether this private contract, made prior to the statute, satisfies the qualifying terms of the statute irrespective of the facility development date factor. Thus, the night-and-day difference between Occidental and this case is evident. The Appellate Division in the case under review itself acknowledged the key distinction: "the contract in Occidental was not, as in the case at bar, executed prior to the enactment of the statute” (Matter of F.W.E. Stapenhorst, Inc. v Public Serv. Commn., 146 AD2d 422, 425). The existence of the valid and enforceable prestatute contract between Stapenhorst and NY-SEG thus excludes this case from Occidental’s orbit. Moreover, the dictum in that case that " 'the entire [statutory] program was designed, not only to encourage the creation of new facilities, but also the full, productive use of such facilities’ ” bears no relevance to the dispositive analysis here (id., quoting Matter of Occidental Chem. Corp. v Public Serv. Commn., supra, at 155).
*583 We should look at what the parties agreed to do in their contract and what they expected to achieve, with no apparent awareness or expectation of a future statutory windfall. The parties’ private goal in 1978 was the creation of an "alternate energy facility” and its full, productive use. Stapenhorst’s signature on the contract is conclusive evidence that it had secured a guaranteed purchaser of its renovated facility’s entire output, with local public tax abatements and substantial research and development up-fronted funds. Those constitute significant privately agreed-to contractual incentives and benefits designed to serve the parties’ common and respective goals. We find no patent or interpretative basis on which to conclude that the Legislature intended Public Service Law § 66-c (1) to induce a party to fulfill preexisting contractual obligations at an added expense to a utility’s ratepayers. The contracting parties’ intent under this contract is clear and is therefore controlling (see, e.g., Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291). No cause for judicial contractual reformation, bestowing new additional benefits under Public Service Law § 66-c (1), is shown on the ground that the deal did not turn out to be as advantageous as Stapenhorst had hoped.
Stapenhorst claims alternatively that Federal law entitles it to a higher price for the electricity it sells to NYSEG (Public Utility Regulatory Policies Act [PURPA] of 1978 [16 USC § 2601 et seq.]). PURPA became effective on November 9, 1978 —the same day the parties entered into the contract at issue. Pursuant to section 210 of PURPA (16 USC § 824a-3), the Federal Energy Regulatory Commission (FERC) promulgated facilitating regulations in 1980 (18 CFR part 292). It, too, seeks to encourage the development of small power production plants by categorizing as "new capacity” facilities on which construction commenced after November 9, 1978. Utilities must pay at least the full "avoided costs” for electricity from such plants (18 CFR 292.101 [b] [6]; see, Allied Chem. v Niagara Mohawk Power Corp., 72 NY2d 271, 274, n, cert denied — US —, 109 S Ct 785). Stapenhorst argues that its plant, as a "new capacity,” qualifies for the assumedly higher "avoided costs” benefit.
Once again, this contention dissipates under the terms and very existence of the parties’ contract. FERC expressed clearly that the regulatory scheme was not intended to affect contracts in place before the promulgation of the regulations, *584 even if a contracting party qualified as a "new capacity” power producer (see, 18 CFR 292.301 [b] [2] ["Nothing in this subpart * * * (a)ffects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase.”]). The Preamble for regulations implementing section 210 of PURPA is cogently instructive: "That a [qualifying] power production facility entered into a [preexisting] binding contractual arrangement with an electric utility indicates that it is likely that sufficient incentive existed, and that the further encouragement provided by these rules was not necessary” (45 Fed Reg 12214, 12218 [emphasis added]). Congress enacted PURPA and the contract was executed coincidentally on November 9, 1978. The implementing regulations —effective as of 1980 — make PURPA’s prospective application clear and unquestionably exclude preexisting contracts from its incentive bonus.
Stapenhorst lacks any safety net in either statutory scheme allowing it to escape from its preexisting contractual obligations. Apart from all else that has been said, to allow it to do so would provide it with a double benefit (the contractually secured incentives plus the added statutory ones) at the expense of the ratepayers, a result clearly not contemplated or intended in the respective statutory enactments. Had a statutory or regulatory enhancement for preexisting contracts been desired, the respective legislative bodies would certainly, in this highly technical and regulated field, have made that choice inescapably clear — as they should before we confer such a governmentally mandated monetary subsidy by judicial interpretation.
In light of the dispositive contractual and statutory analysis, it is unnecessary to reach the constitutional impairment of contract argument urged in opposition to reformation of this contract.
The order of the Appellate Division should be reversed, with costs, and the petition dismissed.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
Order reversed, etc.