## In re MEGAN–RACINE ASSOCIATES, INC., Debtor.

### No. 96–CV–292 (RSP).

United States District Court,
N.D. New York.

July 12, 1996.

Menter, Rudin & Trivelpiece, P.C., Syracuse, NY (Mitchell J. Katz, Jeffrey A. Dove, of counsel), Nixon, Hargrave, Devans & Doyle, L.L.P., Washington, DC (Robert L. Daileader, Jr., of counsel), for Megan–Racine Associates, Inc.

Swidler & Berlin, Chtd., Washington, DC (Michael L. Shor, Edward Berlin, Robert V. Zener, William J. Mertens, of counsel), Brian K. Billinson, Syracuse, NY, for Niagara Mohawk Power Corp.

Hancock & Estabrook, L.L.P., Syracuse, NY (Stephen A. Donato, Michael C. Griffen, of counsel), for Kraft Foods, Inc.

Dewey Ballantine, for Federal Deposit Insurance Corp., Washington, DC (Earle H. O'Donnell, Zori G. Ferkin, of counsel), Dewey Ballantine, New York City (Sandor E. Schick, Wayne A. Cross, of counsel), Hodgson, Russ, Andrews, Woods & Goodyear, L.L.P., Albany, NY (Deborah L. Kelly, of counsel), for Federal Deposit Insurance Corp.

House, Kingsmill, Riess & Seabolt, L.L.P., New Orleans, LA (Marguerite K. Kingsmill, W. Richard House, of counsel), for Hudson Engineering Corp.

## MEMORANDUM–DECISION AND ORDER

POOLER, District Judge.

## INTRODUCTION

Niagara Mohawk Power Corp. ("Niagara") seeks to terminate its obligation to pay for the electricity it purchases from debtor Megan–Racine Associates, Inc. ("Megan") at the rate specified in New York's former six-cent law.[1] The six-cent law required utilities like Niagara to purchase electricity from co-generators such as Megan at a minimum rate of six cents per kilowatt hour. In 1992, the New York State Legislature repealed the six-cent law but grandfathered its subsidized rate for co-generators that had filed contracts with the New York State Public Service Commission ("PSC") on or before June 26, 1992.[2] The central issue this bankruptcy appeal presents is whether the legislature intended to restrict the grandfathered six-cent rate to co-generators that, in addition to having filed contracts with the PSC as of June 26, 1992, also, as of that date, operated in accordance with federal government standards for qualified co-generation facilities. I hold that the legislature intended to restrict the benefits of grandfathering to facilities that met federal efficiency and operating standards and therefore reverse the bankruptcy court order holding to the contrary.

## BACKGROUND

Niagara entered into a power purchase agreement ("PPA") with Megan in 1987. This contract required Niagara to purchase all the electricity Megan produces at rates set in accordance with Niagara's SC–6 tariff. Record on Appeal ("ROA"), Tab 40, Ex. A–A (Agreement) ¶¶ 4, 9. The SC–6 tariff requires Niagara to pay at the six-cent rate if the six-cent law applies. Federal Deposit Insurance Corp. ("FDIC") Br., Dkt. No. 45, at 2 (quoting PSC No. 207 Electricity, Twenty–Ninth Revised Leaf No. 101, eff. Oct. 1, 1995). Megan filed its PPA with the PSC on April 13, 1988. ROA, Tab 53, Ex. C, (Letter from John J. Kelliher, Secretary PSC, to Gary C. Coram, Assistant Power Contract Director Niagara, of 4/20/88). Megan began operating as a co-generator in 1991. *Megan–Racine Assoc. Inc.*, 73 FERC ¶ 61,308 at 61,859 (1995) ("Decertification Decision"). In December 1995, however, the Federal Energy Regulatory Commission ("FERC") found that Megan had not met qualifying facility ("QF") requirements for efficiency and operations during the years 1991 through 1994. *Id.* Niagara argues that because Megan did not become a QF prior to June 26, 1992, Niagara need not pay Megan at the six-cent rate and instead can pay its significantly lower avoided cost rate. The difference between Niagara's avoided cost rate and the six-cent rate on a monthly basis approximates $1.4 million. *Compare In re Megan–Racine Assoc., Inc.*, Bankr.Case No. 92–00860, slip. op. at 8 (Bankr.N.D.N.Y. Feb. 2,

---

1. Former N.Y.Pub.Serv.L. § 66–c(1) (McKinney 1989) (repealed 1992 N.Y.Laws c. 519 § 3).

2. 1992 N.Y.Laws c. 519 §§ 3–4.

1996) (Stephen D. Gerling, C.J.) ("February 2d Bankr.Order") *with* Declaration of Michael L. Shor, Dkt. No. 3, ("Shor Decl.") ¶ 4. Megan and other interested parties contend that Megan has satisfied all requirements for payments under the six-cent law because its contract was executed and filed before June 26, 1992, and FERC has found that Megan is now a QF. *See Megan–Racine Assoc., Inc.,* 74 FERC ¶ 61,032 at 61,078 (1996) ("Recertification Decision").

I will discuss in turn the history of the six-cent law and the procedural background for this appeal.

## I. The Six Cent Law

Although the procedural and historical background of Niagara's appeal is complex, the appeal itself presents only one legal issue: *whether the six-cent law applies to a co-generation facility that had filed a fully executed contract with the PSC before June 26, 1992, but was not a QF within the meaning of the Public Utility Regulatory Policies Act ("PURPA"), the governing federal law, on or before June 26, 1992.*

To explain that single issue, however, I must review briefly the history of PURPA and the six-cent law. Congress passed PURPA in 1978 to encourage the development of alternative energy sources. *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 745, 750, 102 S.Ct. 2126, 2130, 2132–33, 72 L.Ed.2d 532 (1982). PURPA required the Federal Power Commission ("FPC"), FERC's predecessor, to issue rules mandating electric utilities like Niagara to offer to both sell and purchase electric energy from qualifying co-generation facilities, or QFs. 16 U.S.C. § 824a–3(a). However, PURPA also mandated that "[n]o such rule . . . shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." *Id.* § 824a–3(b). This incremental cost is often referred to as the "avoided cost." In order to be a QF, a co-generator must meet certain operating and efficiency standards. *See* 18 C.F.R. § 292.205 (1995).

Prior to the enactment of PURPA, the FPC had exclusive authority—with limited exceptions—to regulate wholesale power rates under the Federal Power Act ("FPA"). *See Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 378–81, 103 S.Ct. 1905, 1909–11, 76 L.Ed.2d 1 (1983). PURPA departed from this general rule by empowering and obligating state regulatory agencies to implement FERC's rules for QF's through the state agencies' own rule-making. 16 U.S.C. § 824a–3(f)(1). In 1981, New York passed the six-cent law. Pursuant to this statute, the PSC could order utilities to enter into contracts with certain power producers, including small co-generation facilities. N.Y.Pub.Serv.L. § 66–c(1). Former Section 66–c(1) also required utilities to purchase electricity at a minimum rate of six cents per kilowatt hour from facilities that met state statutory requirements even if the utility's avoided cost was less than six cents. *Id.* § 66–c(2). In 1982, the PSC issued a generic decision setting rates in accordance with the six-cent law.[3] *In re Consolidated Edison Co.,* 48 P.U.R. 4th 94 (1982).

Consolidated Edison challenged the PSC's power to set rates in excess of a utility's avoided costs by appealing the rate-setting order. New York's Court of Appeals held that (1) PURPA did not preempt the state from setting a minimum purchase rate in excess of avoided costs for QF's, but (2) the FPA did preempt New York from compelling utilities to offer to purchase power from facilities that qualify only under state law. *Consolidated Edison Co. v. Public Serv. Comm'n,* 63 N.Y.2d 424, 438, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984), *appeal dismissed,* 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985) (*"ConEd "*).

In 1992, New York—with support from both electric utilities and QF's—repealed the six-cent law prospectively but retained its benefits for certain facilities. In his program bill memorandum, the governor noted:

The minimum purchase price provision of § 66–c . . . is no longer necessary to en-

---

**3.** Although I was a Public Service Commissioner in 1982, I did not participate in deciding this case because the Consumer Protection Board, of which I had been Executive Director, had participated as a party.

courage the development of alternative energy facilities.... The minimum purchase price could, in fact, interfere with the smooth transition to competitive bidding and the advantages that such programs can provide, particularly with respect to maximizing cost-effective demand-side management opportunities. This bill, thus, repeals this provision, while providing reasonable grandfathering for those facilities already incorporating such a provision within contracts approved by the Public Service Commission.

Governor's Program Bill 1991 Memorandum at 5–6. The bill's New York State Assembly sponsor also described the twin goals of the repeal and grandfathering provisions as (1) putting an end to unwarranted ratepayer subsidies and (2) providing protection for existing contracts. He said:

> The bill preserves the benefit of the six cent price for all developers with contracts filed prior to June 26, 1992. The intent of the grandfathering provision is to protect those developers who have satisfied all of the Public Service Commission's criteria for an enforceable contract, while protecting ratepayers from unwarranted future subsidies.

Letter from Hon. Paul D. Tonko to Hon. Mario Cuomo of 7/15/92. The PSC's counsel also stressed the unfairness of continuing the six-cent subsidy:

> The six cent minimum exceeds the estimated avoided cost of producing electricity for electric corporations and requires a subsidy from the ratepayers.... This [independent power] industry is now well established and there is no further need to continue the substantial subsidy from ratepayers.

Memorandum from William J. Cowan, PSC General Counsel, to Elizabeth Moore, Counsel to the Governor, of 7/20/92, at 2.

Insofar as relevant to this appeal, the amendment provides:

> ... the minimum sales price for purchased electricity from any ... co-generation facility ... of six cents per kilowatt hour for each utility, as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect (a) for any contract fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two and ... (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price ... for the duration of any such contract and subject to the terms and conditions of such contract and performance thereunder....

N.Y.Pub.Serv.L. § 66–c(2) (McKinney Suppl. 1996).

## II. Procedural History

As noted earlier, Megan and Niagara entered into a PPA in 1987. In addition to requiring Niagara to purchase power from Megan, the contract required Megan to provide Niagara with proof that Megan was a QF prior to commencing operations. Agreement ¶ 1. Megan therefore applied to FERC for QF status on November 22, 1988. FERC issued an order certifying Megan as a QF on January 27, 1989. *Megan–Racine Assoc., Inc.*, 46 FERC ¶ 62,074 (1989).

On March 17, 1992, Megan filed a Chapter 11 proceeding in bankruptcy court. Almost two and one-half years later, on August 1, 1994, Niagara filed an adversary proceeding seeking a declaration that its PPA with Megan was null and void because Megan had never achieved QF status. ROA, Tab 40, Katz Aff. ¶ 3, Ex. A. On February 24, 1995, Niagara also filed a motion in the Chapter 11 proceeding seeking to escrow the difference between its avoided costs and the payments due under the six-cent law. February 2d Bankr.Order, at 6. Megan then filed a motion for summary judgment or a stay in the adversary proceeding on February 27, 1995. ROA, Tab 40. The bankruptcy court denied summary judgment without prejudice and stayed the adversary proceeding to allow FERC to determine Megan's QF status. *In re Megan–Racine Assoc., Inc.*, 180 B.R. 375, 383 (Bankr.N.D.N.Y.1995). On April 19, 1995, Bankruptcy Judge Gerling denied Niagara's escrow motion. *In re Megan–Racine Assoc., Inc.*, 192 B.R. 321, 328 (Bankr. N.D.N.Y.1995). Niagara sought reconsideration of the April 19th order, and Judge Ger-

ling denied reconsideration on August 31, 1995. *See* February 2d Bankr.Order, at 7–8.

On April 21, 1995, Niagara filed a decertification petition with FERC seeking a declaration that Megan failed to meet QF standards for calendar years 1991 through 1994. Decertification Decision, 73 FERC ¶ 61,308 at 61,859. Megan answered Niagara's petition and also requested a temporary waiver of FERC's operating and efficiency standards. *Id.* at 61,860. Megan filed a separate application for recertification on October 27, 1995. Recertification Decision, 74 FERC ¶ 61,032 at 61,079.

FERC decided Niagara's decertification petition and Megan's waiver request in a decision it filed on December 14, 1995. The commission found that Megan did not meet QF operating and efficiency requirements for 1991 and 1992 and did not satisfy QF efficiency standards for 1993 and 1994. Decertification Decision, 73 FERC ¶ 61,308 at 61,859. FERC also denied Megan's waiver application on both equitable and substantive grounds. *Id.* at 61,862–61,864.

On January 19, 1996, FERC issued an order granting Megan's recertification application. Based on Megan's information, FERC found that "if the Megan–Racine facility operates as described in the application, it will meet for calendar year 1995 and thereafter, all of the requirements for a qualifying co-generation facility under the Commission's regulations implementing PURPA." Recertification Decision, 74 FERC ¶ 61,032 at 61,080.

On December 19, 1995, Niagara moved once more within the Chapter 11 proceeding to terminate its payments pursuant to the six-cent law. ROA, Tab 3. Niagara based its motion on FERC's decertification decision. Niagara placed the difference between the avoided cost payment and the six cent rate—almost $1.5 million[4]—into its attorney's escrow account. February 2d Bankr.Order, at 8–9. On December 28, 1995, Niagara belatedly sought permission to deposit the difference between the six-cent rate and the avoided cost rate (the "differential") into court pending the bankruptcy court's

determination on the merits of the termination decision. ROA, Tab 4 (Application). On February 2, 1996, Judge Gerling issued a decision and order in which he found (1) that Megan did not meet QF standards for 1991 through 1994; (2) Pub.Serv.L. § 66–c(2) required as a precondition to grandfathering only that a co-generator have a contract executed and filed prior to June 26, 1992, that provided for the purchase of power at a utility tariff rate incorporating the minimum sales price; (3) Niagara had violated the automatic stay of 11 U.S.C. § 362(a) by unilaterally escrowing the differential; and (4) Niagara's behavior was not sanctionable. February 2d Bankr.Order at 14, 16, 21–23. Judge Gerling directed Niagara to turn the escrowed differential over to Megan within ten days of February 2, 1996. *Id.* at 23. Niagara appealed the February 2d order and requested that Judge Gerling stay his order pending appeal. Judge Gerling briefly stayed his order but on February 15, 1996, denied Niagara's request for a stay and directed Niagara to turn over the escrowed funds on or before February 19, 1996. *In re Megan–Racine Assoc., Inc.,* Bankr.Case No. 92–00860, slip. op. at 9 (Bankr.N.D.N.Y.1996) ("Stay Order").

Niagara then requested a stay in this court. On April 1, 1996—after granting two shorter stays—I granted Niagara a stay pending appeal and set an expedited schedule for briefing and argument. *In re Megan–Racine Assoc.,* 1996 WL 167681 at *11 (N.D.N.Y.1996). On April 11, 1996, the FDIC moved to further expedite the appeal. Dkt. No. 25. I granted the FDIC's motion and set oral argument for May 6, 1996. Dkt. No. 34. The FDIC next moved—on April 23, 1996—to vacate the stay imposed by my April 1st Order. This motion was returnable on May 6, 1996, along with Niagara's appeal. Dkt. No. 39.

In early May 1996, an explosion in Megan's steam turbine generator destroyed the generator and damaged other equipment as well as the facility itself. Dkt. No. 59, Letter from Peter L. Hubbard, Esq., to Court, of

---

4. Although Niagara estimates the average monthly differential at $1.4 million, the differential for

the December bill allegedly was close to $1.5 million. February 2d Bankr.Order, at 8.

5/9/96, at 1–2. Therefore, the plant was not operational at the time of oral argument and is still not operational. Because Megan has both property damage insurance and business-interruption insurance, the co-generator hopes to rebuild. *Id.* at 2–3. However, Megan's counsel advises that the feasibility of rebuilding is largely dependent on resolution of the issue presented by this appeal—that is whether Niagara will pay Megan six cents per kilowatt hour or its lower avoided cost rate. *Id.* at 3.

I heard oral argument on both the FDIC's motion to vacate the stay and Niagara's appeal on May 6, 1996. On June 5, 1996, on stipulation of Niagara, Megan and the FDIC, I ordered Niagara to deposit the differential with the Clerk of the Court and to deposit additional interest in accordance with the parties' stipulation.

## DISCUSSION

### I. Standard

 In reviewing the bankruptcy court's decision, I may set aside only clearly erroneous findings of fact, but I review conclusions of law *de novo*. Bankr.R. 8013; *In re the Lionel Corp.,* 29 F.3d 88, 92 (2d Cir.1994). This appeal presents a purely legal issue of statutory interpretation, and therefore I review the bankruptcy court's conclusions *de novo*.

### II. Summary of the Parties Argument

In addition to Megan, the following parties oppose Niagara's position on appeal:

1. The FDIC. As the receiver for the Bank of New England, N.A., which provided financing for Megan, the FDIC claims a lien on any proceeds from Megan's contract with Niagara.

2. Kraft Foods, Inc. ("Kraft"). Kraft operates a cheese manufacturing plant in Canton, N.Y., and uses the steam Megan generates.

3. Hudson Engineering Corporation ("Hudson"). Hudson built Megan's facility

and claims to be Megan's primary unsecured creditor.[5]

Megan, the FDIC, and Kraft argue that the language of Section 66–c(2) unambiguously imposes only three requirements for grandfathering. These requirements are: (1) a facility must be a co-generator within the meaning of Pub.Serv.L. § 2.2–a, (2) the co-generator and the utility must have fully executed a contract on or before June 26, 1992, and (3) the parties must have filed their contract with the PSC on or before June 26, 1992. Niagara responds that I must read Section 66–c(2)'s language in light of the New York Court of Appeals' holding in *ConEd.* Because this landmark case held that non-QF's were not entitled to the six-cent rate under the repealed six-cent law, Niagara argues that the most reasonable reading of the statutory language is that non-QF's as of June 26, 1992, did not receive the benefit of grandfathering. While Megan and its allies concede that *ConEd* has a place in the interpretation of Section 66–c(2), they argue that the Court's preemption concerns are satisfied if co-generators do not receive the benefit of the six-cent rate for periods during which they do not meet QF standards. Each side also argues that cases from the PSC and New York courts support its interpretation of the statutory language. In addition, Niagara urges that I read Section 66–c(2) in light of the legislative purpose of ending a subsidy that had outlived its usefulness. Finally, both sides focus on the reliance interest Section 66–c(2) protects. While Niagara urges that Megan—which, at best, first met QF operating and efficiency standards in 1995—has no legitimate reliance interest, Megan and the FDIC believe that the interest of a co-generator in a six-cent rate accrues when the co-generator incurs obligations such as bank financing based on its contract.

Hudson takes a slightly different path from the other parties opposing Niagara's appeal. Hudson argues that Niagara has obtained an illegal preference over other creditors and violated the statutory stay by withholding the differential. Because Hudson's argument has force only if the differen-

---

**5.** TransCanada Gas Marketing, Limited, which opposed the stay application, has not taken a position on the appeal itself or on the application to vacate the stay.

tial is property of the estate in bankruptcy, the substantive issues that Niagara, Megan, Kraft, and the FDIC raise must determine the outcome of this appeal.

I conclude that (1) the language of Section 66–c(2) is ambiguous; (2) existing case law regarding Section 66–c(2) does not interpret the language at issue; (3) *ConEd*, which as of July 1992 represented a definitive interpretation of the state's power to impose the six-cent rate,[6] also controls interpretation of the partial savings clause attached to that rate's repeal; (4) resort to consideration of legislative purpose is appropriate because of the statute's ambiguity; (5) the purpose of the 1992 amendment to the six-cent law was to stanch the flow of unearned subsidies to independent power producers while preserving an entitlement to the six-cent rate for those independent power producers that had relied legitimately on existing law; (6) the savings clause in Section 66–c(2) must be construed strictly because it constitutes an exception to a repeal of a subsidy that the legislature had determined was unwarranted; (7) reading the language of Section 66–c(2) in light of *ConEd*, principles of strict construction applicable to statutes that mandate a subsidized rate, and general concepts applicable to grandfathering, compels the conclusion that New York did not intend to grandfather the minimum rate for contracts in which an operational co-generation facility was not operating in compliance with federal standards as of the statutory cut-off date.

### III. The Statutory Language

■ For convenience, I repeat the relevant statutory language:

> ... the minimum sales price for purchased electricity from any ... co-generation fa-

cility ... of six cents per kilowatt hour for each utility, as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect (a) for any contract fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two and ... (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price ... for the duration of any such contract and subject to the terms and conditions of such contract and performance thereunder....

N.Y.Pub.Serv.L. § 66–c(2).

If Section 66–c(2) is clear on its face, I may not look to extrinsic sources. N.Y.Stat. § 76 (McKinney 1971). However, because Section 66–c(2) grandfathers a subsidy, the intent to grandfather must be "inescapably clear." *F.W.E. Stapenhorst, Inc. v. Public Serv. Comm'n*, 75 N.Y.2d 577, 584, 555 N.Y.S.2d 24, 554 N.E.2d 61 (1990). Section 66–c(2) grandfathers the six-cent rate for electricity purchased from a "co-generation facility ... for any contract fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two...." All parties agree that Megan is and was a co-generation facility and that its contract was signed and filed with the PSC before June 26, 1992. Megan and its supporters therefore urge that the statutory language unambiguously grandfathers the statutory rate for Megan's contract.

Niagara emphasizes different portions of the statutory language. Section 66–c(2) also provides that the six-cent rate "as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect."[7] Niag-

---

6. Recently, FERC has cast doubt on two aspects of the *ConEd* holding. *See Connecticut Light & Power Co.*, 70 FERC ¶ 61,012 at 61,029–30 (1995), 1995 WL 9931, at *8, *reconsid. denied*, 71 FERC ¶ 61,035 (1995) (holding that PURPA preempted states from imposing rates in excess of avoided costs, but declining to enforce this order retroactively); *Southern California Edison Co.*, 71 FERC ¶ 61,269 (1995), 1995 WL 327268, *8 (indicating in *dicta* that states can require utilities to purchase power from alternative energy facilities that are not QF's).

7. Niagara abandoned its reliance on another portion of the statutory language. In arguing for a stay, Niagara contended that the requirement that a facility have a "fully executed" contract meant that the facility must have performed under the contract at least to the extent of becoming a QF. Niagara Mem., Dkt. No. 12, at 6–7. Niagara does not press this argument on appeal. Niagara does continue to argue, however, that the phrase "subject to the terms and conditions of such contract and performance thereunder" means that only facilities that had performed under the contract received grandfathering. Ni-

ara reasons that this language means that an individual co-generator must have had an entitlement under Chapter 843 that came into being some time before the grandfathering cutoff date. Chapter 843 of the Laws of 1981 enacted the minimum price provision of former Section 66–c(1). 1981 N.Y.Laws c. 843 § 9. *ConEd* limited the applicability of the rate established by Chapter 843 and Section 66–c(1) to qualified facilities. *ConEd,* 63 N.Y.2d at 438, 483 N.Y.S.2d 153, 472 N.E.2d 981. Consequently, Niagara urges that the rate "as established by chapter [843]" means a rate applicable only to QF's and other FPA-exempt facilities. In Niagara's view, Megan had no entitlement to the six-cent rate "as established by chapter [843] of the laws of [1981]" on June 26, 1992, and therefore no entitlement that could be grandfathered. Put another way, Megan had no entitlement that could "remain in full force and effect."

Megan, Kraft, and the FDIC contend that Niagara has created a subject for the verb phrase "shall remain in full force and effect" that does not exist in the statute. They maintain that it is the minimum sales price generically and not an individual generator's entitlement to the minimum sales price that remains in full force and effect. Niagara responds that because the statute states that "the minimum sales price ... shall remain in full force and effect ... for any contract," the minimum sales price is not an abstract concept that can be parsed from the entitlement of the individual alternative energy facility. In addition, even accepting Megan's identification of the subject as "minimum sales price," that minimum sales price is the rate set by former Section 66–c(1), which was understood well before the partial repeal and grandfathering to apply only to QF's. Therefore, Niagara's interpretation is soundly grounded in the statutory language.

Megan and its supporters also argue that had the New York State legislature wished

to limit entitlement to grandfathering to QF's, then it would have done so explicitly. Pursuant to N.Y.Stat. § 74 (McKinney 1971), they claim that I am barred from supplying the missing words. Section 74 provides:

> A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.

Niagara's adversaries note that the legislature demonstrated its ability to distinguish between QF's and other co-generation facilities when it enacted Section 189 of the Tax Law. *See* N.Y.Tax L. § 189(6) (McKinney Suppl.1996). Because the legislature has distinguished between QF's and other co-generation facilities in the tax context, Megan and its supporters argue that it is particularly inappropriate to assume that the legislature unintentionally omitted the words "federally qualifying facility" in Section 66–c(2). Although the prohibition against supplying a missing term is an important one, I also must assume that the legislature intended to comply with *ConEd* when it repealed but partially grandfathered the six cent rate. *See Orinoco Realty Co. v. Bandler,* 233 N.Y. 24, 30, 134 N.E. 823 (1922) (holding that "[w]hen the Legislature amends or considers afresh a statute it will be assumed to have knowledge of judicial decisions interpreting the statute as then existing, and if it deals with it in a manner which does not rebut or overthrow the judicial interpretation, it will be regarded as having legislated in the light of and as having accepted such interpretation"). Thus, the omission of the actual words "federally qualifying facility" from the statute is not dispositive.

Moreover, Niagara persuasively argues that the legislature had at least two good reasons for declining to state specifically that grandfathering applied only to QF's. First,

---

agara Br. Dkt. No. 33, at 11. In the April 1st order, I characterized this language as ambiguous. *In re Megan–Racine Assoc.,* 1996 WL 167681 at *10. However, the quoted language comes late in the statute, well after the delineation of the terms under which entitlement to the six-cent rate will be grandfathered. Because of

this placement, the better reading of "subject to the terms and conditions of such contract and performance thereunder" is that the terms and conditions of the contract control the extent to which a facility will be eligible to receive the six-cent rate but not its initial entitlement.

*ConEd* allowed the state to impose the six-cent rate on facilities other than QF's as long as those facilities had an independent basis for exemption from the FPA's preemptive effect. *ConEd,* 63 N.Y.2d at 439 n. 11, 483 N.Y.S.2d 153, 472 N.E.2d 981. Therefore, if the legislature specifically limited grandfathering to QF's alone, then it would have granted a more restrictive grandfathering than it had the power to grant. Second, in Niagara's view, the legislature did not need to explicitly limit its grandfathering to federally qualifying facilities because by the time of the 1992 amendment, the limits of the state's power were well known.

I find that the language of Pub.Serv.L. § 66–c(2) is ambiguous. Although the omission of the words, "federally qualified facility" supplies a basis for reading the language as Megan, the FDIC, and Kraft urge, the phrase "the minimum sales price … as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one shall remain in full force and effect" suggests that the previously established eligibility of a co-generator for the six-cent rate may be determinative.

Furthermore, no existing precedent definitively clarifies the ambiguous statutory language. Although the parties each claim that certain decisions of the PSC and the New York State Supreme Court support its position, none of the decisions relied on addresses the question this appeal presents.

Niagara relies principally on *Sterling Power Partners, L.P. v. Niagara Mohawk Power Corp.,* Case No. 110354/94 (N.Y.Sup.Ct. New York County, October 26, 1995) *appeal pending.* Niagara cites *Sterling* for the proposition that co-generators can be grandfathered only for the rights they had as of June 26, 1992. Niagara Br., Dkt. No. 33, at 19. However, *Sterling* construes language different from that at issue in this appeal. The last clause of Section 66–c(2) provides that the minimum six cent rate shall remain in effect for any such facility which has been producing electricity in addition to the electricity which is the subject of a contract previously entered into with an electric corporation for such facility, which contract provides for the purchase of electrici-

ty in accordance with subdivision (a) of this section; provided, however, that the minimum sales price shall only be paid for electricity that does not exceed the maximum annual amount of electricity produced by such facility as of the effective date of this subdivision and does not exceed the amount of electricity provided for in the contract by more than ten percent. . . .

N.Y.Pub.Serv.L. § 66–c(2)(c). In *Sterling,* a co-generator claimed that because it had begun producing energy less than a year before the effective date of Section 66–c(2), it could annualize its production figures, thus requiring Niagara to purchase more electricity at the six-cent rate than Sterling had produced in any twelve month period prior to the effective date of the statute. *Sterling,* slip op. at 4–5. Justice Gammerman rejected this argument, holding that the statute clearly mandated that Sterling could collect the subsidized rate for only that capacity that Sterling "ha[d] been producing" prior to the effective date of the statute. *Id.* at 7 (quoting Section 66–c(2)(c), (emphasis omitted)). Justice Gammerman's interpretation of Section 66–c(2)(c) therefore has no direct impact on how I should interpret Section 66–c(2)(a).

The parties opposing Niagara's appeal nevertheless argue that dictum in *Sterling* favors their position. Justice Gammerman noted that the parties did not dispute Sterling's entitlement to the six-cent minimum price "since the Agreement was executed and approved prior to June 24, 1992." *Id.* at 6. However, Justice Gammerman also noted that Sterling was a QF within the meaning of PURPA. *Id.* at 1. Because QF status was uncontroverted in *Sterling,* the dictum in that decision does not persuade me that QF status is irrelevant to a determination of entitlement to grandfathering.

Megan and the FDIC also contend that two PSC cases, *In re United Supply of Am.,* 1993 WL 104489 (PSC 1993) and *In re Chittenden Falls Hydro Power, Inc.,* 1993 WL 278872 (PSC 1993), support their position. Neither of these cases holds that the sole requirements for grandfathering are co-generator status and execution and filing of a contract before June 26, 1992. *Chittenden*

*Falls* merely holds that a facility's entitlement to grandfathering expires upon cancellation of its contract. *Chittenden Falls,* 1993 WL 278872 at *2. *United Supply* holds that a contract that was neither fully executed nor filed prior to June 26, 1992, was not grandfathered. *United Supply,* 1993 WL 104489 at *3. Neither *Chittenden Falls* nor *United Supply* addresses the issue of the eligibility for grandfathering of a non-QF.

Although no case the parties cite provides a clear answer to the relevant question of statutory interpretation, all three reflect a tendency by the courts and the PSC to construe Section 66–c(2) strictly. Because former Section 66–c(1) granted a subsidy, the New York Court of Appeals held that it should be construed strictly. *F.W.E. Stapenhorst,* 75 N.Y.2d at 584, 555 N.Y.S.2d 24, 554 N.E.2d 61. If I must strictly construct a law granting a subsidy, then I also must strictly construct the partial grandfathering of that subsidy within a subsequent repeal measure.

Having found that Section 66–c(2) does not unambiguously answer the question of a non-QF's entitlement to grandfathering, I next consider the legislative history, general concepts of grandfathering, and, most importantly, the significance of *ConEd.*

## IV. Legislative History

The FDIC and Megan correctly note that many portions of the legislative history of Section 66–c(1), indicate that the six-cent rate will be grandfathered for contracts filed and executed before June 26, 1992. FDIC Br., Dkt. No. 45, at 8 n. 8; Megan Br., Dkt. No. 46, at 12.[8] However, the FDIC overlooks equally salient portions of the legislative history that emphasize the legislative

purpose of ending an unwarranted subsidy from ratepayers to QF"s. The governor noted that "the minimum purchase price ... [was] no longer necessary." Governor's Program Bill 1991 Memorandum at 5–6. The bill's Assembly sponsor spoke of "protecting ratepayers from unwarranted future subsidies." Letter from Hon. Paul D. Tonko to Hon. Mario Cuomo of 7/15/92. Finally, the PSC's counsel referred to the six-cent law as an "artificial price support," and said "there is no further need to continue the substantial subsidy from ratepayers." Memorandum from William J. Cowan, PSC General Counsel, to Elizabeth D. Moore, counsel to the Governor, of 7/20/92 at 2.

Read as a whole, the legislative history indicates a resolve to protect ratepayers from an unwarranted subsidy while protecting the legitimate interests of alternate energy producers that had relied on the six-cent law by filing executed contracts before June 26, 1992. My interpretation of the legislative history, especially the statements I quoted, is that the legislature intended to continue the six-cent subsidy only to those facilities that had demonstrated a previous entitlement.

## V. Grandfathering Policies

The parties agree that the purpose of grandfathering provisions is to protect existing reliance interests. Niagara Br., Dkt. No. 33, at 12; FDIC Br., Dkt. No. 45, at 10; Megan Br., Dkt. No. 46, at 20. Niagara suggests that the reliance interest must be measured as of the grandfathering date. Niagara argues that Megan has no legitimate reliance interest because Megan, although operational on June 26, 1992, was not then a QF and knew or should have known that it was not a QF.[9] The FDIC and Megan re-

---

8. The FDIC cites to the Governor's Statement approving the six-cent law repeal and a letter dated July 21, 1992, from William E. Davis, Niagara's president, to Elizabeth D. Moore, counsel to the Governor. FDIC Br., Dkt. No. 45, at 8 n. 8. Additional references to the filing requirement are in a Memorandum from the Elizabeth D. Moore, counsel to the Governor, to Howard A. Fromer, General Counsel, of 7/14/92, at 3; a Memorandum from the PSC's General Counsel, William J. Cowan to Elizabeth D. Moore, counsel to the Governor, of 7/20/92, at 2; and a letter from Hon. Paul D. Tonko to Hon. Mario Cuomo of 7/15/92.

9. Niagara relies on the FERC decertification decision to support its claim that Megan knew or should have known it was not a QF. *See* Niagara Br., Dkt. No. 33, at 14 (citing Decertification Decision, 73 FERC ¶ 61,308 at 61,860). The FDIC also may have had cause to suspect Megan was not a QF. An officer of the management firm acting as the FDIC's agent indicated on February 14, 1992, that the "QF status of the plant is in jeopardy." ROA Tab 49, Ex. E at 1 (minutes of Ranall L. Kutch, Bank of New England, of 2/14/92).

spond that Megan's reliance interest actually accrued when it signed a PPA incorporating the six-cent rate. These parties reason that a co-generator incurs legal obligations both to its contractor and to a financing institution on the strength of its executed and filed PPA, and therefore a co-generator has a protectable reliance interest from that date forward. They also claim that Niagara's interpretation would lead to financial chaos because a brief period of non-compliance extending through June 26, 1992, could jeopardize a long-term contract.[10] The scenario that the FDIC and Megan paint is a specter, however. FERC has been extremely generous in granting waivers to QF's except in the most egregious and prolonged instances of non-compliance. *See* Niagara Br., Dkt. No. 33, at 15 n. 13 (collecting cases). A facility that experienced a brief period of non-compliance could make a waiver application and avoid the adverse consequences that Megan and the FDIC hypothesize.

Two other factors merit consideration. First, as described above, the legislature had already determined as of June 26, 1992, that the six-cent law forced ratepayers to pay an unwarranted subsidy even with respect to those co-generators that were QF's. It is therefore likely that the legislature intended to place the risk of a co-generator's noncompliance with QF standards as of June 26, 1992, on the co-generator and its financer—both of whom benefit from the unwarranted subsidy—rather than on utility ratepayers. Second, *ConEd* placed all relevant parties—including co-generators and banks and the legislature—on notice that a non-QF co-generator had no right to the six-cent rate. Therefore, co-generators were in a position to correct existing non-compliance problems well in advance of the cutoff date.

■ In general, a grandfathering statute protects parties that acted in reliance on earlier, revoked entitlements. *See, Tataranowicz v. Sullivan,* 959 F.2d 268, 277 (D.C.Cir.1992) *cert. denied,* 506 U.S. 1048, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993). Although Megan signed a contract and secured financing, it did not become a QF while the six-cent law was in effect. QF status was a

*sine qua non* of entitlement to the six-cent rate under the law repealed in 1992. *ConEd,* 63 N.Y.2d at 438, 483 N.Y.S.2d 153, 472 N.E.2d 981. Therefore, Megan had not in any legitimate way relied on the provisions of the six-cent law prior to June 26, 1992. Megan's situation is quite different from that of a developer with a signed contract that had not yet commenced operation as of June 26, 1992, because the second developer would have done all that was possible to comply with the statute as of the June 26th date.

## VI. *Consolidated Edison*

I turn finally to the key piece of this statutory interpretation puzzle, which is the impact of *ConEd.* Because the Court of Appeals held in 1984 that New York lacked the power to order utilities to purchase power from co-generation facilities that were not QF's or otherwise exempt from the FPA, Niagara urges that Section 66–c(2) can reach only facilities that were exempt from regulation under the FPA as of June 26, 1992.

Before amendment, Section 66–c(1) required an "electric corporation" to purchase electricity from a "co-generation facility," at a minimum rate of six cents per kilowatt hour. N.Y.Pub.Serv.L. § 66–c(1) (McKinney 1989), repealed 1992 N.Y.Laws, c. 519 § 3. The statute as written did not require co-generators to be QF's within the meaning of federal law to receive the six-cent rate. However, the Court of Appeals held in *ConEd* that provisions of the FPA preempted New York from requiring electric utilities to purchase power from purely state qualifying alternate energy facilities. *ConEd,* 63 N.Y.2d at 438, 483 N.Y.S.2d 153, 472 N.E.2d 981. If "the Legislature amends ... a statute it will be assumed to have knowledge of judicial decisions interpreting the statute as then existing, and, if it deals with it in a manner which does not rebut or overthrow the judicial interpretation, it will be regarded as having legislated in the light of and as having accepted such interpretation." *Orinoco Realty,* 233 N.Y. at 30, 134 N.E. 823. Niagara thus argues that when the legislature amended Section 66–c in 1992 to repeal

---

**10.** Megan's period of non-compliance was, of

course, anything but brief.

the six-cent law prospectively but preserve it for certain co-generators, it necessarily intended the word "co-generators" to have a meaning consistent with the holding of *ConEd.* In Niagara's view, the word co-generators therefore must be construed as co-generators that are QF's or otherwise exempt from FPA preemption.

While conceding that the state could not constitutionally enforce the six-cent rate for a period of time in which a co-generation facility did not meet federal standards, Megan and the FDIC urge that *ConEd* has no impact on the state's ability to grandfather a contract filed as of a certain date. These parties argue that any preemption concerns are addressed adequately by denying the six-cent payments to co-generators for periods during which they are not QF's.[11]

Although the FDIC urges that Niagara's interpretation requires the reader to add words not present in the statute, the FDIC's interpretation also implies additional language. Accepting Niagara's interpretation requires adding the words "that was a QF as of June 26, 1992" after "co-generation facility." Accepting the FDIC's interpretation requires insertion of the words, "subject to divestment during periods when the co-generation facility is not a QF" after "the minimum sale price . . . shall remain in full force and effect. . . ." The answer to the statutory interpretation issue thus turns not on strict construction but rather on which implied addition better fits with the legislature's mandate to grandfather in compliance with *ConEd.*

In my April 1st order, I suggested that the FDIC's (and Megan's) interpretation did not respond adequately to the *ConEd* holding because the Court of Appeals stated: "the State is preempted by provisions of the Federal Power Act (FPA) from requiring electric utilities to offer to purchase power from purely State qualifying alternate energy facilities." *ConEd,* 63 N.Y.2d at 430, 483 N.Y.S.2d 153, 472 N.E.2d 981. If the state

lacks the authority to order a utility to purchase power from a non-QF, then *a fortiori,* it lacks the authority to grandfather a subsidized rate for a contract between a utility and a co-generator that is not a QF. *In re Megan–Racine,* 1996 WL 167681 at *9.

Megan and the FDIC responded to my concern with several different arguments. First, Megan claims that state law did not force Niagara to enter into the PPA. Megan Br., Dkt. No. 46, at 19. Megan's argument is premised on the fact that PURPA requires utilities to enter into long-term contracts with QF's for the purchase of electric power at rates established at the time of the contract. *See* 16 U.S.C. § 824a–3(a); 18 C.F.R. § 292.303(a); 292.304(d). Because the genesis of the obligation can be found in PURPA, Megan reasons that state law is not preempted. Megan's analysis ignores the fact that both former and current state law go beyond PURPA. Former Section 66–c(1) required utilities to enter into long-term contracts with all co-generators, not just those co-generators that were QF's. The repealed section also required utilities to pay at the six-cent rate rather than avoided costs as provided in PURPA. Therefore, it is disingenuous to claim that state law did not mandate Niagara's contract with Megan. Were it not for the obligation under former Section 66–c(1) to enter into a long-term contract with a co-generator at a six-cent rate, Niagara and Megan would not have had a contract that could be grandfathered.

Second, the FDIC argues that neither state law nor PURPA required Niagara to enter into a contract with Megan that required it to purchase electricity during periods in which Megan did not have QF status and that there are therefore no preemption concerns. FDIC Br., Dkt. No. 45, at 22–23. The FDIC's contention is true but irrelevant. In repealing and partially grandfathering the six-cent rate, the legislature necessarily considered facts as they existed on June 26, 1992, not during future periods in which a facility might or might not be a QF. The

11. In the appellees' view, the issue presented is one of contractual compliance and thus properly a matter for the adversary proceeding. The FDIC urges that to treat QF status as anything other than a contractual issue unwarrantedly at-

tributes to the legislature an intent to impair existing contracts. FDIC Br., Dkt. No. 45, at 14–16. However, entitlement to the six-cent rate exists by virtue of statute, not contract.

question is whether, in light of *ConEd* and the legislature's own concerns about unwarranted subsidies, the legislature intended to grandfather the six-cent rate for operational facilities that had not yet met QF standards. A utility's ability to negotiate terms for periods of non-compliance does not aid in resolving this question.

Finally, the FDIC and Megan rely on a decision allowing a QF to regain QF status after losing it. *Metropolitan Dade Cty.,* 65 FERC ¶ 61,090, 1993 WL 427164 (1993). If the claim in this appeal concerned a co-generator that had QF status as of the grandfathering cutoff date but later lost it, the FDIC's argument might prevail. However, in this case, Megan did not have QF status on the crucial grandfathering date.[12]

The arguments of the FDIC and Megan ignore the interplay among the obligation to enter into long-term contracts imposed by former Section 66–c(1), the *ConEd* decision, and the grandfathering provision in existing Section 66–c(2). Section 66–c(1) imposed on utilities an obligation to enter into long-term contracts with co-generators at the six-cent rate. *ConEd* later restricted the state's power so that it only could require utilities to enter into long-term contracts with co-generators that had QF status or were otherwise exempt from the FPA. Section 66–c(2) grandfathers the minimum rate established by Section 66–c(1) for certain contracts. Under *Orinoco,* I must assume that the legislature was aware of *ConEd* and intended to conform the grandfathering clause to its mandate. I therefore cannot assume reasonably that the legislature intended to grandfather contracts that it could not have ordered Niagara to make in the first instance.

## CONCLUSION

The language of Section 66–c(2) indicates that a rate "established by chapter eight hundred and forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect." *ConEd* definitively required the state to interpret Chapter 843 as limited to QF's. Therefore, the most reason-

able interpretation of the language of Section 66–c(2) is that the minimum rate remained in full force and effect only for those facilities that were entitled to the rate on June 26, 1992. Existing case law interpreting both Section 66–c(2) and former Section 66–c(1) buttresses this conclusion as does exploration of the legislature's concern about an unwarranted subsidy. Finally, operating facilities that had not attained QF status as of June 26, 1992, had no legitimate reason to rely on the continued existence of the six-cent rate. I find that in order to have the six-cent rate grandfathered for its contract, a co-generation facility that was operational on June 26, 1992, must have met QF operational and efficiency standards on or before that date. Because I reject the bankruptcy court's interpretation of the relevant statutory language, I must reverse the order from which Niagara appeals.

It is therefore

ORDERED that the decision appealed from is reversed; and it is further

ORDERED that the FDIC's application to vacate the stay pending appeal is denied as moot.

IT IS SO ORDERED.

---

12. If Megan now has QF status, the state certainly could require Niagara to purchase power from Megan. However, the purchase would be at Niagara's avoided cost rate and not the six-cent rate.